Allen PETERSON, Appellant,

v.

STATE of Alaska, DEPARTMENT OF NATURAL RESOURCES, Appellee.

No. S–13376.

Supreme Court of Alaska.

July 2, 2010.

Rehearing Denied Aug. 18, 2010.

356

**358**

Kenneth P. Jacobus, Kenneth P. Jacobus, P.C., Anchorage, for Appellant.

David T. Jones, Assistant Attorney General, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for Appellee.

Before: FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

Allen Peterson, a seasonal forester formerly employed by the Alaska Department of Natural Resources (DNR), Division of Forestry (the "Division"), appeals the grant of summary judgment entered against him. Peterson's claims concern the Division's removal of his firefighting qualifications following an incident in 2005, the Division's failure to hire or transfer him into a full-time forester position, the Division's reduction of his work time, and his perception that the Division's employees have harassed him and created a hostile work environment. Peterson argues that the Division's actions constituted age, sex, and disability discrimination; that the Division breached the implied covenant of good faith and fair dealing; and that the Division violated state and national standards in removing his firefighting qualifications. The superior court granted summary judgment as to all claims.

Following the superior court's entry of final judgment, Peterson moved for relief from judgment based on Alaska Civil Rule 60(b). In support of that motion, Peterson submitted a number of documents that now appear in the record but were not before the superior court when it granted summary judgment. Peterson's Rule 60(b) motion was denied, but he does not appeal that ruling. Peterson appeals the superior court's grant of summary judgment and argues that we may consider the whole record and are not limited to those facts and arguments that were before the superior court when it ruled on the mo-

tion for summary judgment. We disagree and instead consider only the record that was before the superior court at the time summary judgment was granted.

Based on that record, we affirm the superior court's grant of summary judgment, holding that Peterson has presented no evidence raising genuine issues of material fact and that DNR is entitled to judgment as a matter of law.

## II. FACTS [1]

■ The State of Alaska, Department of Natural Resources (DNR), Division of Forestry (the "Division") employed Allen Peterson in various forest management jobs beginning in October 1990. Peterson assumed his most recent position as a regional stewardship forester for the Kenai–Kodiak region in 1999 and worked out of an office in Soldotna. Peterson's main responsibility in that job involved the administration of timber sales—ensuring that harvesting units are in compliance with existing state contracts.

There are two programs offered by the Division: one focusing on the management of forest resources and one dedicated to wildland fire management. Resources employees are encouraged to "obtain firefighting qualifications, certified on red cards, so that they are qualified for fire assignment" but employees are neither required to perform firefighting duties, nor are they guaranteed to participate in firefighting. Peterson was a seasonal employee in the resources program but had obtained such "red card" firefighting qualifications.

■ Peterson's claims focus on several distinct circumstances concerning his employment with the Division: the suspension of his firefighting qualifications; the increase in his unpaid seasonal layoff period; the failure to either laterally transfer him into a full-time position or select him for one of several full-time openings; and several work-

---

1. These facts and characterizations of Peterson's claims are taken from the record that was before the superior court at the time that it granted summary judgment on August 28, 2008. Assertions of fact that appear only in the pleadings or supporting memoranda are not admissible evidence, and accordingly we do not rely upon them for the purposes of our review of summary judgment. *Brock v. Rogers & Babler, Inc.,* 536 P.2d 778, 783 (Alaska 1975).

place incidents that Peterson claims were harassing in nature and/or created a hostile work environment. In our consideration of the relevant facts of each situation, we "draw all reasonable inferences in favor of" Peterson.[2]

### A. The Removal Of Peterson's Firefighting Qualifications

In May 2005 Peterson responded to a fire emergency in Homer known as Fire 072. While Peterson claims that his actions at this fire were the result of following direct orders, Matt James, the incident commander at Fire 072, submitted a negative evaluation of Peterson's performance. James's evaluation identified several areas where Peterson's performance did not meet expectations, including Peterson's knowledge of the job, his attitude, his ability to make decisions under stress, his ability to work safely by understanding the fuel type, and his willingness to immediately follow orders. According to James's report, Peterson's failure to properly extinguish a portion of the fire caused the fire to "jump[ ] the line behind the nozzle" and destroy some booster line and one-inch fire hose.

Following the Fire 072 incident, the area forester for the Kenai–Kodiak region, James Peterson (no relation to Allen Peterson), reviewed the circumstances surrounding the fire. Based on the "reports of Al Peterson's conduct at the 072 fire, in particular, his lack of situational awareness, failure to respond appropriately to the changing fire conditions, and his failure to follow the instructions of the Incident Commander," James Peterson suspended two of Allen Peterson's firefighting qualifications and returned him to trainee status for those positions.

Peterson requested review of this decision, but both Regional Fire Management Officer John See and Chief of Fire and Aviation Lynn Wilcock upheld the removal of these qualifications. At about the same time in 2006, Wilcock reviewed Peterson's overall participation in the fire management program and concluded that Peterson represented a "potential liability" to the program. After considering reports of Peterson's behavior, Wilcock identified three examples of problematic conduct leading to his decision: Peterson's actions at Fire 072, an incident at a 2004 fire that resulted in property damage and a complaint about Peterson's people skills, and a 2006 office incident where Peterson reportedly had a violent and unprofessional outburst. Peterson's firefighting qualifications for participation in the fire management program were withdrawn following this review.

### B. The Increase In Peterson's Seasonal Layoff Period

In 1999, shortly before Peterson transferred into the Forest Stewardship program, his position was reclassified as seasonal. Most of the Division's employees are seasonal. Seasonal status means that the Division has full discretion to determine the period of employment that a particular employee will work each year. In its official memorandum notifying Peterson of this change, the Division explained that the change in position status was not performance-related but was "solely due to a lack of funding." The Division's Stewardship program is entirely funded by federal grants. As a result of this reclassification, Peterson was eligible for non-competitive layoff recall to full-time positions for three years, but Peterson did not exercise these rights for available positions. Although Peterson was technically a seasonal employee and had not been returned to full-time status, he was provided with year-round employment for several years following the reclassification of his position because of available funds in the budget. But each year the Division sent Peterson a memorandum reminding him that he remained subject to seasonal layoffs.

In November 2005 the Division informed Peterson that he would be subject to a seasonable layoff from January 16 to 31, 2006—a period of just over two weeks. Peterson's layoff period was increased to one month for the 2007 fiscal year. In support of its motion for summary judgment, DNR provided an affidavit from the forestry resources program manager, Martha Welbourn–Freeman,

---

**2.** *Ellis v. City of Valdez*, 686 P.2d 700, 702 (Alaska 1984).

stating that the increase in layoff time was due to a decrease in the level of federal funding for the Stewardship program and that Peterson's layoff was extended to six months in 2008.

### C. The Division's Failure To Offer Peterson A Lateral Transfer Or Select Him For A Full–Time Forester Position

In September 2004 the Division received legislative approval to hire a full-time forester for the Kenai–Kodiak area. After a competitive recruitment process, a woman named Ashley Reed was hired for the position. In August 2005 Reed left the position "to pursue other opportunities." According to the Division's forest stewardship coordinator, the opening created by Reed's departure was not advertised for competitive recruitment until October 2006 because of a decline in federal funding.

Beginning in October 2006 the Division held a competitive recruitment for the full-time forester position in the Kenai–Kodiak area. Nine applicants, including Reed and Peterson, were interviewed by the hiring committee. DNR provided affidavits from two of the three committee members explaining the evaluation process and stating that Reed had been unanimously selected for the position. When Reed declined the position, another applicant was selected to fill the position in October 2007 on the basis of her "overall qualifications."

Peterson claimed in his briefs and at oral argument that he also "twice requested transfer to a full time position in both 2004 and 2006," but there is little in the record to support this claim. The collective bargaining agreement that Peterson was subject to authorized such a transfer to be made without recruitment or application, if the State so chooses. A non-competitive lateral transfer was not provided to Peterson.

In 2007 the Division held another competitive recruitment for an operations forester position in the Kenai–Kodiak area. Five applicants with the requisite qualifications were interviewed, including Peterson and John Winters. The committee unanimously selected Winters for the position based on "work experience, references, attitude, ability to accept supervision, level of trust and confidence we could place in the employee, and performance in the interview."

### D. Workplace Incidents That Peterson Claims Were Harassing In Nature And/Or Created A Hostile Work Environment

In addition to the events previously summarized, Peterson identifies several other incidents as events which he contends were either harassing in nature or created a hostile work environment, including Matt James's evaluation, a conversation with his supervisor, and a conversation with a co-worker.

In his deposition testimony, Peterson described a conversation with his supervisor, Jeff Graham, in which Graham indicated that his superiors "want[ed Peterson] out." Peterson's response to DNR's interrogatories stated that Graham also said, "[w]hen you're looking for your next job they'll have to come to me." Graham's affidavit stated that he did not recall making these comments to Peterson, but we will assume that Peterson's version of the events is correct for the purposes of our review.[3]

Peterson's deposition testimony and interrogatory responses also identified a conversation with Regional Forester Mike Curran as a suspect interaction. Peterson explained that he was riding in an elevator with Curran and commented on Curran's jacket which said "Curran Consultant Forestry" on it. In response, Curran answered, "Maybe it's trying to tell you something." Peterson felt that this comment was demeaning and interpreted it to mean that he (Peterson) should consider consulting because he did not have a future in the Division.

Peterson also identified Matt James's negative evaluation of his performance at Fire 072 as a suspect interaction that created or reflected a hostile work environment. Peterson explained that James commented in a telephonic Division meeting between Ric

3. *Ellis,* 686 P.2d at 702.

Plate, James, and Peterson that Peterson was not safe. Peterson stated that the comments were demeaning.

## III. PROCEEDINGS

In August 2007 Peterson filed a complaint in superior court asserting six claims against DNR: (1) that the Division created a hostile work environment which constituted sex, age, and disability harassment; (2) that the reduction in Peterson's work time constituted sex, age, and disability discrimination; (3) that the reduction in his work time was a violation of the implied covenant of good faith and fair dealing; (4) that the withdrawal of his firefighting qualifications was not in accordance with state procedures and violated applicable national standards; (5) that the hiring of Reed constituted age and sex discrimination; and (6) that the selection of Winters as the operations forester was a violation of the implied covenant of good faith and fair dealing. In July 2008 DNR moved for summary judgment on all claims.

On August 28, 2008, the superior court granted the motion for summary judgment, along with a statement that "the court finds [DNR's] arguments persuasive as to all issues." The superior court entered final judgment on November 19, 2008.

On December 7, 2008, Peterson moved to be relieved from the order of summary judgment and the final judgment pursuant to Rule 60(b). In support of this motion, Peterson filed a thirty-two page memorandum and a short affidavit and attached a significant number of documents and exhibits that were not before the superior court prior to the entry of final judgment. DNR opposed the Rule 60(b) motion. In the meantime, Peterson filed the current appeal, but it was stayed pending the resolution of the Rule 60(b) motion. Shortly thereafter, the superior court denied Peterson's Rule 60(b) motion, stating that Peterson did not establish "grounds for relief under Civil Rule 60(b)."

The stay in the current appeal was lifted in January 2009. Peterson does not appeal the denial of his Rule 60(b) motion.

## IV. STANDARD OF REVIEW

We review the superior court's grant of summary judgment de novo and draw "all factual inferences in favor of" and view "the facts in the light most favorable to the non-prevailing party."[4] We affirm a grant of summary judgment "when there are no genuine issues of material fact, and the prevailing party . . . [is] entitled to judgment as a matter of law."[5]

## V. DISCUSSION

### A. Peterson's Rule 60(b) Motion And Its Supporting Documentation Are Not Part Of The Record For Purposes Of Reviewing The Grant Of Summary Judgment.

After the superior court entered final judgment, Peterson moved for relief under Rule 60(b). In support of the motion, he submitted substantial additional evidence that was not before the superior court when it granted summary judgment. The court denied the motion, but Peterson does not appeal this ruling. Nonetheless, Peterson argues that we should consider this additional evidence in our review of the superior court's summary judgment ruling.

We addressed a similar argument in *Schmitz v. Yukon–Koyukuk School District*.[6] In *Schmitz*, after summary judgment was entered against him, the plaintiff moved for reconsideration and provided the superior court with additional evidence.[7] The superior court found that the new evidence had been withheld for tactical reasons and was untimely, and therefore declined to consider it.[8] Because the superior court did not abuse its discretion in so ruling, we too declined to consider the evidence on appeal.[9] Other courts have stated explicitly what we implied

4. *Rockstad v. Erikson*, 113 P.3d 1215, 1219 (Alaska 2005).

5. *Id.*

6. 147 P.3d 720, 727–28 (Alaska 2006).

7. *Id.* at 727.

8. *Id.*

9. *Id.* at 727–28.

in *Schmitz:* that appellate review of a grant of summary judgment is limited to the evidence that was before the superior court when its rendered its decision.[10] DNR maintains that "[i]f a plaintiff who loses on summary judgment could use a Rule 60(b) motion to supplement the record on appeal with documents and arguments he inexcusably failed to present in opposition to the summary judgment motion, the summary judgment process would become a virtually meaningless exercise." We agree.

■ If Peterson wished us to review whether the additional evidence warranted relief from the grant of summary judgment because of "mistake, inadvertence, surprise or excusable neglect" or "newly discovered evidence," he had the option of appealing the denial of his Rule 60(b) motion. But he did not do so, apparently for tactical reasons. We review grants of summary judgment de novo but review a ruling on a Rule 60(b) motion under the more deferential abuse of discretion standard.[11] As Peterson's counsel candidly explained at oral argument, he did not consider an appeal of the denial of the Rule 60(b) motion to be in Peterson's best interest because "the review [of a summary judgment ruling] is de novo [and] we don't want to convert the case to abuse of discretion. That doesn't make any sense from Mr. Peterson's point of view." We agree that Peterson is entitled to de novo review of the grant of summary judgment based on the record that was before the superior court at the time it issued its ruling.[12] But because Peterson declined, for tactical reasons, to

appeal the Rule 60(b) motion, we do not consider the additional evidence submitted in support of that motion as part of our review of the grant of summary judgment.

**B. The Superior Court Did Not Err In Granting Summary Judgment On Peterson's Claims.**

**1. The superior court did not err in granting summary judgment on Peterson's discrimination claims.**

Of the six claims for relief contained in Peterson's complaint, three of them allege discrimination: (1) that he was harassed and subjected to a hostile work environment because of his sex, age, and alleged disability;[13] (2) that his employer reduced his work time because of his sex, age, and alleged disability; and (3) that he was passed over for several full-time positions because of his sex and age. We will consider each claim in turn.

**a. The superior court did not err in granting summary judgment on the hostile work environment claims.**

Alaska Statute 18.80.220 provides employees with broad protection against discriminatory treatment by making it unlawful for employers to discriminate against a person "because of the person's race, religion, color, or national origin, or because of the person's age, physical or mental disability, sex, marital status, changes in marital status, pregnancy, or parenthood when the reasonable demands of the position do not require distinction on [that] basis."

---

10. *See, e.g., MacGlashing v. Dunlop Equip. Co.,* 89 F.3d 932, 936 (1st Cir.1996); *Guillory v. Domtar Indus. Inc.,* 95 F.3d 1320, 1327 (5th Cir. 1996); *Yanowitz v. L'Oreal USA, Inc.,* 36 Cal.4th 1028, 32 Cal.Rptr.3d 436, 116 P.3d 1123, 1127 (2005); *see also* 5 Am. Jur. 2d Appellate Review § 649 (2009).

11. *Compare Rockstad v. Erikson,* 113 P.3d 1215, 1219 (Alaska 2005) (grant of summary judgment reviewed de novo) *with Ghete v. Anchorage,* 948 P.2d 973, 975 (Alaska 1997) (denial of Rule 60(b) motion reviewed for abuse of discretion).

12. If Peterson believed he lacked the evidence to successfully oppose DNR's summary judgment motion, he could have made a Rule 56(f) request seeking additional time to gather evidence before filing an opposition. Such requests are liberally granted. *See Hymes v. DeRamus,* 119 P.3d 963,

965 (Alaska 2005). He failed to do so. DNR contends that Peterson had adequate opportunity to oppose the motion for summary judgment and made no showing that the evidence submitted in support of his Rule 60(b) motion could not have been presented to the superior court at the time he filed his opposition to DNR's motion for summary judgment.

13. Although Peterson claims disability discrimination, the details of his alleged disability are unclear. His response to DNR's discovery request states: "Mr. Peterson injured his left foot in 1992–1993 and has symptoms until the present. He injured his right foot in 2002–2003, as a direct result of his left foot injury. Surgery on the left foot was conducted November, 2007."

■ Peterson alleges that he was subjected to several incidents that amounted to harassment sufficient to constitute a hostile work environment: that Jeff Graham told Peterson that the people above Graham wanted Peterson out; that Mike Curran commented to Peterson that Curran's consulting jacket might be "trying to tell [Peterson] something"; that the removal of Peterson's firefighting qualifications was harassment because it was without justification; that hiring Winters for the 2007 operations forester position was retaliatory in nature;[14] and that Matt James's description of Fire 072 demeaned Peterson.[15]

DNR counters that Peterson "failed to offer any evidence that his sex, age, or alleged disability played any role in any of those incidents." DNR offered affidavits to the superior court in support of its position that unlawful discrimination was not involved in the incidents to which Peterson points. For example, DNR provided an affidavit from Graham where Graham states that he does not recall telling Peterson that the people above him (Graham) wanted Peterson gone, but that if he had, "it could only have been in the context of a supervisory conversation intended to encourage Mr. Peterson to improve his work performance by alerting him to concerns expressed about his work by others in the division." DNR also points out that Peterson admitted in his deposition that he did not know why Curran made the comment about the jacket and that he thought that the removal of his firefighting qualifications was connected to James Peterson's personal dislike of Allen Peterson, not sex, age, or disability discrimination.[16] Finally, Peterson does not offer any explanation of how Winters's selection for the operations forester position is connected to his age, sex, or disability, and he offers no evidence to show that Winters is not in the same protected class as himself,[17] except to point out that he and Winters had different job classifications before Winters was selected for the operations forester position. The only evidence that Peterson presented to the superior court in opposition to the motion for summary judgment that connects any of these incidents to Peterson's age, sex, or disability was Matt James's statement in his report that Peterson "appears to have issues working for people younger or lower on the 'org chart' than himself."

■ In assessing a claim that an employee's work environment violates Alaska law, we "consider federal precedent for guidance," and after reviewing Title VII cases we concluded that "discriminatory behavior sufficiently severe or pervasive to alter the conditions of the victim's employment and to create a discriminatory hostile work environment violates AS 18.80.220."[18] We also considered federal precedent in deciding what conduct was actionable in the hostile work

**14.** While Peterson described the hiring of John Winters as "retaliatory" in the facts section of his opening brief, the hiring was not raised as a separate claim of retaliation under AS 18.80.220(a)(4) in Peterson's complaint or in his opposition to summary judgment. Because the allegations of retaliation were not raised below, we hold them to be waived as a separate claim and consider them only in the context of Peterson's claims of a hostile work environment and breach of the covenant of good faith and fair dealing. *See Baseden v. State*, 174 P.3d 233, 239 n. 17 (Alaska 2008).

**15.** Peterson's reply brief also argues that he was humiliated by the display of the burned fire hose that was destroyed in Fire 072, but the record before the superior court at the time summary judgment was granted did not provide any support for this allegation, as it was first raised in Peterson's memorandum in support of his Rule 60(b) motion. We also do not rely on unsupported assertions of fact in memoranda for purposes of our review of summary judgment. *Brock v. Rogers & Babler, Inc.*, 536 P.2d 778, 783 (Alaska 1975). We therefore do not consider this assertion.

**16.** While there may be some minor dispute between the parties about James Peterson's actions toward Allen Peterson when Allen Peterson's firefighting qualifications were taken away, Allen Peterson neither alleges that James Peterson's actions were motivated by age, sex, or disability, nor does he present any evidence showing such discrimination.

**17.** Peterson and Winters are both men, and Peterson does not argue that Winters is a member of a different age group.

**18.** *French v. Jadon*, 911 P.2d 20, 28 (Alaska 1996); *see also Alaska State Comm'n for Human Rights v. Yellow Cab*, 611 P.2d 487, 490 (Alaska 1980) (using Title VII decisions for guidance in interpreting Alaska anti-discrimination law).

environment context and adopted the *Harris v. Forklift Systems, Inc.*[19] rule that "the challenged conduct must be severe or pervasive 'enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive.' "[20] In *Harris*, the Supreme Court of the United States further elaborated that, "[w]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances, which may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[21] The United States Supreme Court has also held that " 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment' " and that anti-discrimination laws are not intended to be a "general civility code."[22]

▉ Even viewing the facts in the light most favorable to Peterson, we conclude that he has not established the existence of a hostile or abusive work environment. Curran's comments were offhand and cryptic; even though Peterson may have interpreted them to mean that he did not have a future with the Division, they were not objectively threatening. Similarly, Graham's comments, made on a single occasion, even if interpreted as a veiled threat to Peterson's job or future employment prospects, constituted an isolated incident that was not sufficient to demonstrate a change in the terms and conditions of Peterson's employment.

Peterson's other claim centers around the Matt James report and the removal of Peterson's firefighting qualifications. Peterson implies that the removal of these qualifications changed the terms and conditions of his employment to some extent. Peterson presents the loss of his firefighting qualifications as an example of the hostile work environment actions taken by the Division against him. However, this claim is more appropriately considered as an independent claim that the Division subjected him to an adverse employment action for discriminatory reasons. We therefore consider whether the Division's actions to remove Peterson's firefighting qualifications, including the Matt James evaluation, were based on impermissible factors that include sex, age, or disability in violation of AS 18.80.220.

▉ Because it is "usually impossible" for an employee to prove that the actions of an employer were motivated by discriminatory intent,[23] we have adopted the three-part pretext analysis that "involves a series of shifting burdens"[24] for claims of employment discrimination where there is no direct evidence of discriminatory intent, known as the *McDonnell Douglas* test.[25] First, the employee bears the burden of establishing a prima facie case of disparate treatment by showing intentional discrimination.[26] The

---

**19.** 510 U.S. 17, 21–23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (elaborating on the standard first enunciated in *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).

**20.** *French,* 911 P.2d at 28 (quoting *Harris,* 510 U.S. at 21, 114 S.Ct. 367).

**21.** 510 U.S. at 23, 114 S.Ct. 367.

**22.** *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (internal citations omitted).

**23.** *Miller v. Safeway, Inc.,* 102 P.3d 282, 290 (Alaska 2004).

**24.** *Raad v. Alaska State Comm'n for Human Rights,* 86 P.3d 899, 904 (Alaska 2004).

**25.** *Brown v. Wood,* 575 P.2d 760, 770 (Alaska 1978) (adopting the test named for the United States Supreme Court case where it was articulated: *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)), *modified,* 592 P.2d 1250 (Alaska 1979); *see also Raad,* 86 P.3d at 904; *VECO, Inc. v. Rosebrock,* 970 P.2d 906, 918–19 (Alaska 1999); *Haroldsen v. Omni Enters., Inc.,* 901 P.2d 426, 430 (Alaska 1995).

**26.** To establish that the Division removed his firefighting qualifications with intent to discriminate, Peterson needs to show that "(1) he is a member of a protected class under the statute; (2) he was qualified for the position; (3) he suffered adverse employment action, despite these qualifications; and (4) the employer treated him less favorably than other qualified persons." *Miller,* 102 P.3d at 291.

prima facie case serves to eliminate "the most common nondiscriminatory reasons" for the adverse action and "raises an inference of discrimination only because we presume that these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." [27] Second, the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for its actions.[28] Third, the employee bears the final burden of demonstrating that the employer's stated reason for the action was pretextual.[29]

■ As a matter of law, Peterson failed to establish a prima facie case that either the removal of his firefighting qualifications or Matt James's negative evaluation was the result of discrimination. As discussed earlier, DNR points out that Peterson "failed to offer any evidence that his sex, age, or alleged disability played any role" in the Division's actions toward Peterson. In his opposition to the motion for summary judgment, Peterson offered nothing to show that his sex or disability were implicated in the decision to remove his firefighting qualifications, nor is there any evidence suggesting that he was treated less favorably than other Division resources employees. The only evidence Peterson offered was that Matt James's evaluation stated that Peterson "appear[ed] to have issues working for people younger ... than himself." This statement, in context, was referring to Peterson's interpersonal skills and does not suggest that Peterson was given a negative evaluation because of his age. There was no further evidence to show that Peterson's age was even taken into account in the decision to remove his firefighting qualifications or in the two reviews of the

decision. We therefore conclude that Peterson failed to raise a reasonable inference that his age was the underlying reason that his qualifications were taken away.

Even if Peterson had established a prima facie case, DNR met its burden at the second step of the *McDonnell Douglas* test by offering evidence showing legitimate, nondiscriminatory reasons for withdrawing Peterson's firefighting qualifications. Peterson makes no further attempt to argue that any of DNR's justifications were pretextual, thus also failing the third prong of the *McDonnell Douglas* test.

**b. The superior court did not err in granting summary judgment on Peterson's claim that the reduction of his work time was the result of unlawful discrimination.**

■ Peterson also claims that the diminution of his work time from permanent full time to permanent seasonal in October 2006 was a discriminatory decision. Peterson's brief simply asserts that the decision to reduce his position to six months was "a discriminatory decision, and a pretext to give the job to Ashley Reed, a young female," but Peterson offered no evidence to connect the reduction in his work time to his age, sex, or alleged disability. For example, he produced no evidence showing that other individuals outside of his protected class were treated more favorably by receiving shorter layoff periods.[30] We conclude that Peterson failed to establish a prima facie case of discrimination with regard to his reduced work time.

---

27. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978)); *see also State, Dep't of Fish & Game, Sport Fish Div. v. Meyer*, 906 P.2d 1365, 1374 (Alaska 1995) ("In the first stage, the employee claiming discrimination must introduce evidence raising an inference of employer discriminatory intent."); 45C Am. Jur. 2d *Job Discrimination* § 2460 ("This consists of evidence that, under the circumstances, raises at least a reasonable inference that the action taken by the employer, if otherwise unexplained, was based on impermissible factors. . . .").

28. *Miller*, 102 P.3d at 291.

29. *Id.*

30. Peterson's argument that John Winters was treated differently is unclear. Although Peterson asserts that Winters was not in Peterson's protected class because Winters's job classification differed from Peterson's, this argument is without merit. Job classification is not a protected class within the meaning of AS 18.80.220(a). Further, no evidence was provided to the superior court showing that Winters was treated differently with regard to seasonal leave or layoff time.

### c. The superior court did not err in granting summary judgment on Peterson's claims of hiring discrimination.

Peterson claims that the Division discriminated against him on the basis of age and sex when it selected Ashley Reed for the stewardship forester position in February 2007 and when he did not receive a lateral transfer into a full-time position. He also asserts that several of the Division's practices were discriminatory, including the delay in advertising the 2007 stewardship forester position for competitive recruitment to coincide with Reed's return to Alaska, the high evaluations of Reed's job performance, and the early termination of Reed's probationary period during her first period of employment.

Peterson also makes the unsupported claim that he "twice requested transfer to a full-time position in both 2004 and 2006." Peterson argues that the Division had the right to permit his transfer into the full-time position that Reed occupied without competitive recruitment.[31] However, as DNR points out, it was not required to permit such a transfer.[32] Peterson has offered no admissible evidence to demonstrate that he requested such a transfer, and his brief does not explain how the decision to put the job up for competitive recruitment constituted age or sex discrimination.

 Peterson's hiring discrimination claims are analyzed under the same three-part *McDonnell Douglas* test discussed previously.[33] For purposes of summary judgment, DNR expressed its willingness to assume that Peterson had established a prima facie case of sex and age discrimination with regard to the hiring of Reed.[34] DNR then fulfilled its burden at the second prong of the *McDonnell Douglas* test by offering affidavits from two of the three members of the hiring committee that selected Reed. Both hiring committee members explained the interview process and how the interviewees' answers were scored. They stated that Ashley Reed was the top candidate for the position after the "interview scores, education, experience, writing samples, evaluations, and references" were considered.

 After DNR met its burden, Peterson was required to make a showing that this explanation was pretextual.[35] Peterson argues that Reed's evaluations were only higher because of "the discrimination which was occurring in the workplace," but provides no factual support for this argument. In his deposition, Peterson explained that he thought that the influential and powerful people in the Division were female and at least one of them "had a definite preference toward females over the years." He also asserted that he thought that his age was a factor because he was at a higher paygrade than Ashley Reed and thus would be more expensive to hire.

---

**31.** The referenced provision, 11.07, of the collective bargaining agreement governing transfer of General Government Bargaining Unit employees like Peterson reads, "An employee, except a provisional employee, may apply for and be transferred to a position in the same class, or to a 'parallel' or closely related job class at the same pay range in State service."

**32.** Provision 11.07(E) specifically states that "[t]he voluntary transfer of an employee within an agency or between agencies may be made at the discretion of the appointing authority(ies)."

**33.** *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Brown v. Wood*, 575 P.2d 760, 770 (Alaska 1978); *see also Raad v. Alaska State Comm'n for Human Rights*, 86 P.3d 899, 904 (Alaska 2004); *VECO, Inc. v. Rosebrock*, 970 P.2d 906, 918–19 (Alaska 1999); *Haroldsen v. Omni Enters., Inc.*, 901 P.2d 426, 430 (Alaska 1995). As discussed previously, the three steps of the test require the employee to bear the initial burden of establishing a prima facie case; then the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for its actions; and lastly, the employee bears the final burden of demonstrating that the employer's stated reason for the action was pretextual.

**34.** Because DNR does not contest this, we assume that a prima facie case has been established. A prima facie showing would have required Peterson to demonstrate that "(1) [he] belongs to a protected class; (2) [that he] applied for and was qualified for a job for which the employer was seeking applications; (3) [that he] was rejected despite [his] qualifications; and (4) [that] after [he was rejected], the position remained open and the employer continued seeking applications from persons with [his] qualifications." *Raad*, 86 P.3d at 904 (citing *Alaska State Comm'n for Human Rights v. Yellow Cab*, 611 P.2d 487, 490 (Alaska 1980)).

**35.** *See Raad*, 86 P.3d at 904.

A claimant must "offer something more than 'unsupported assumptions and speculation'" to demonstrate that the reason articulated by the employer is a pretext, and "[s]ummary judgment is appropriate when a plaintiff presents 'nothing more than his own subjective belief that the employer's asserted ground' is a pretext." [36] Peterson offered no solid evidence or factual details to substantiate his perception that Reed was selected because she was younger and a woman, but instead relies entirely on "subjective, after-the-fact impressions." [37] Because DNR supported its summary judgment motion with ample evidence that Reed's selection was based on legitimate, non-discriminatory criteria and because Peterson only presented his own subjective belief that DNR's asserted grounds were a pretext, we hold that summary judgment was appropriate.

Peterson's other arguments, that Reed was given preferential treatment in her probationary employment and that leaving the position open until October 2006 was a pretext to ensure that she got the job, were not raised below in opposition to summary judgment. The evidence that Peterson uses to support this argument was not presented to the superior court before it ruled on the summary judgment motion, as it was added to the record as part of the Rule 60(b) motion. We therefore do not consider it.

2. **The superior court did not err in granting summary judgment on Peterson's breach of the implied covenant of good faith and fair dealing claims.**

Peterson argues that the Division violated the implied covenant of good faith and fair dealing by reducing his work time through increasing his seasonal layoff period, by hiring Winters for the operations forester position in 2007, and by removing his firefighting qualifications.

All employment contracts in Alaska include an implied covenant of good faith and fair dealing.[38] A breach of this covenant may be either subjective—where the employer acts with a bad faith purpose, such as to deprive an employee of a benefit of the contract—or objective—"where the employer does not act in a manner which a reasonable person would regard as fair." [39] "The purpose of the covenant is to effectuate the reasonable expectations of the parties, not to alter or to add terms to the contract." [40]

As previously discussed, Peterson was neither entitled by contract to receive a lateral transfer to the full-time operations forester position for which Winters was selected, nor was Peterson entitled to anything more than six months of work as a seasonal employee. DNR provided evidence that its reasons for both increasing Peterson's seasonal layoff period and selecting Winters were not motivated by bad faith.[41] Peterson only offers unsupported assertions: that the Winters hire was retaliatory, that James Peterson had "groomed" Winters for the job, and that the reduction in Peterson's work time may have been a way for DNR to save money. However, in order to defeat summary judgment, Peterson was required to produce admissible evidence tending to dispute DNR's evidence—"an adverse party may not rest upon mere allegations, but must set forth specific facts showing that there is a genuine issue of

---

**36.** *Perkins v. Doyon Universal Servs., LLC,* 151 P.3d 413, 416 (Alaska 2006) (quoting *Mahan v. Arctic Catering, Inc.,* 133 P.3d 655, 661 (Alaska 2006)).

**37.** *Mahan,* 133 P.3d at 661 (requiring the claimant to produce admissible evidence, beyond speculation and unsupported assumptions, sufficient to raise a genuine issue of material fact that the reasons given by the employer were pretextual).

**38.** *Willard v. Khotol Servs. Corp.,* 171 P.3d 108, 113 (Alaska 2007).

**39.** *Pitka v. Interior Reg'l Hous. Auth.,* 54 P.3d 785, 789 (Alaska 2002) (internal quotation marks omitted); *see also Miller v. Safeway, Inc.,* 170 P.3d 655, 658–59 (Alaska 2007).

**40.** *Miller,* 170 P.3d at 659.

**41.** Peterson's suggestion that DNR's budget-related explanation was inaccurate or pretextual is not supported by the record that was before the superior court when it granted summary judgment.

material fact." [42] Peterson was unable to do so with regard to the subjective prong of the breach analysis.

Peterson's argument with respect to the objective element of the covenant suffers from the same fatal flaw: there is a lack of evidence to substantiate his allegations. Peterson claims that Winters was working outside of his job classification responsibility, that James Peterson assisted Winters in getting the position, that Winters faced a smaller panel of interviewers than Peterson faced, that Peterson outscored Winters in the interview, and that Winters had the added advantage of being the last interviewee after being able to hear the other interviews being conducted. Peterson cites to his amended opposition to summary judgment in support of these allegations but does not point to any actual evidence. Because "[a]ssertions of fact in pleadings and memoranda are not admissib[le] evidence and cannot be relied upon for the purposes of summary judgment," [43] we conclude that Peterson has not provided sufficient evidence to show that there is an issue of material fact that would require trial on these claims. [44]

Peterson also argues that the Division's removal of his firefighting qualifications constituted a breach of the implied covenant of good faith and fair dealing because the Division's action violated state and national policies. At his deposition, Peterson explained his central contention—that he "wasn't guilty of anything that would qualify for the decertification" under the National Wildland Coordinating Group's "Wildland Fire and Prescribed Fire Qualifications System Guide," known as PMS 310–1. Peterson contends that the facts of Fire 072 are "central and critical" because they "led to [the] devastation of Mr. Peterson's career with the Division." DNR counters that any dispute about the underlying facts is not material because firefighting is not a duty that is required for Peterson's job, that Peterson has no valid legal claim regarding the withdrawal of these qualifications, and that even if Peterson had such a claim, DNR's good faith reliance on the reports of Peterson's conduct warranted the withdrawal of his qualifications.

As discussed previously, for the Division to have violated the implied covenant of good faith and fair dealing, it must have breached either the subjective or objective prong of the covenant. [45] Peterson does not argue that the Division was subjectively seeking to deny him the benefits of his contract in bad faith, but instead focuses his discussion on whether the removal of his firefighting qualifications and the process by which the removal occurred was objectively unfair. Peterson points to national standards found in PMS 310–1 to support his contention that his conduct was not sufficiently problematic to justify the removal of his qualifications. But PMS 310–1 makes it clear that the decision to allow an individual to engage in firefighting activities is ultimately a subjective determination: "[a] key component in the certification or re-certification process is the subjective evaluation by the appropriate agency official of an individual's capability to perform a position. *Completion of required training and experience*

**42.** *Cikan v. ARCO Alaska, Inc.*, 125 P.3d 335, 339 (Alaska 2005).

**43.** *Brock v. Rogers & Babler, Inc.*, 536 P.2d 778, 783 (Alaska 1975).

**44.** Peterson includes a section in his brief entitled, "The State Violated Various Statutes and Regulations." Within it, he sets out a number of constitutional, statutory, and regulatory citations, arguing that they "are relevant." But the relevance of some of these authorities to his argument is not entirely clear. For example, he begins by citing the oath that he took before assuming his forester position. It appears that the main point of Peterson's argument is that the Division's hiring decisions violated the principles of merit selection, which are enshrined in article XII, section 6 of the Alaska Constitution. But nearly all of the factual assertions in support of this argument are based on portions of the record that were not before the superior court at the time it granted summary judgment. As previously discussed, we do not consider this evidence as part of our review of the summary judgment decision. In any event, the analysis of Peterson's merit selection claim is subsumed within our discussion of Peterson's other claims concerning the hiring process, including his claims of discrimination and his claims concerning the implied covenant of good faith and fair dealing.

**45.** *See Pitka v. Interior Reg'l Hous. Auth.*, 54 P.3d 785, 789 (Alaska 2002).

*requirements alone does not guarantee that an individual is qualified to perform in a position."* (Emphasis in original.)

 Matt James's negative evaluation of Peterson's performance at Fire 072 in combination with the two other incidents cited in Wilcock's review gave ample reason for Peterson's superiors to question his ability to perform in the type of high pressure situations presented by firefighting activities. The Division was empowered to reject Peterson's version of the events that Wilcock cited in favor of the accounts offered by other witnesses. Our past precedent makes it clear that, "[i]f the employer makes a determination in good faith that [ ] misconduct occurred, there is no breach of the implied covenant of good faith and fair dealing, even if the employee could subsequently prove that the factual finding of misconduct was a mistake." [46] Thus, even if Peterson could now prove that Matt James's report was inaccurate, DNR's good faith reliance on James's evaluation of Peterson's performance at Fire 072, for example, would still not constitute a breach of the implied covenant.

We therefore conclude that the superior court's grant of summary judgment on Peterson's claims that the removal of his firefighting qualifications was a breach of the implied covenant of good faith and fair dealing was not error.

## VI. CONCLUSION

For these reasons we AFFIRM the superior court's grant of summary judgment as to all claims.

CARPENETI, Chief Justice, not participating.

**46.** *Holland v. Union Oil Co. of Cal., Inc.,* 993 P.2d 1026, 1035 (Alaska 1999) (quoting *Burton v. Sec. Pac. Nat'l Bank,* 197 Cal.App.3d 972, 243 Cal.Rptr. 277, 281 (1988)).