Paul SMITH, Appellant,

v.

STATE of Alaska, DEPARTMENT OF TRANSPORTATION AND PUBLIC FACILITIES, Appellee.

No. S–13796.

Supreme Court of Alaska.

July 1, 2011.

Hugh W. Fleischer, Law Offices of Hugh W. Fleischer, LLC, Anchorage, for Appellant.

Joan M. Wilkerson, Assistant Attorney General, and Daniel S. Sullivan, Attorney General, Juneau, for Appellee.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

The Alaska Department of Transportation and Public Facilities (DOTPF) fired Paul

Smith, an equipment operator, for misconduct. In 2005, Smith shot a moose while on duty and received a 30–day suspension. In 2006, he took a fuel tank stand from his work station, later claiming that he thought he had received permission to do so. At about the same time, 100 gallons of fuel disappeared from the same station. DOTPF concluded that Smith had stolen the fuel and terminated him.

After unsuccessfully filing a union grievance and complaints with the Alaska Human Rights Commission and the federal Equal Employment Opportunity Commission, Smith, an Alaska Native, filed a complaint alleging four causes of action: (1) discriminatory employment practices violating AS 18.80.220 and Title VII of the Civil Rights Act of 1964; (2) tortious interference with contractual relations; (3) intentional infliction of emotional distress; and (4) breach of the implied covenant of good faith and fair dealing. The superior court granted summary judgment for the State on all counts. Smith appeals the superior court's judgment on the first and fourth causes of action. We affirm the superior court's decision on both claims.

## II. FACTS AND PROCEEDINGS

The Alaska Department of Transportation and Public Facilities employed Paul Smith from 1986 to 2006. Smith's title was "equipment operator," and his duties included snow removal and highway maintenance. He was employed at the Quartz Creek Station near Soldotna.

### A. Disciplinary Proceedings And Termination

On August 29, 2005, Smith shot and field-dressed a moose while on duty. Smith had not requested permission for this absence, and he received a 30–day suspension.

On July 13, 2006, Smith was part of a team replacing an old fuel tank stand at the Quartz Creek Station. According to Smith, he and two other employees, Wally Griglione and Carl Romig, discussed what would happen to the old tank stand and whether it was permissible for one of them to take it. According to Smith, Griglione said "if it's gone, it's gone," a statement which Smith took to grant

permission to take the fuel tank stand. Griglione denied making this statement. Smith also later stated that he had "see[n] other people do it."

The fuel tank stand disappeared "on or about July 13." A general announcement demanding the return of the fuel tank stand was made. Smith returned the tank stand on July 26, though he did not notify anyone that he had returned it. When asked if he taken the tank stand, Smith admitted that he had.

Around the same time, in mid-to-late July, 100 gallons of fuel from the Quartz Creek Station disappeared. Because Smith had admitted taking the tank stand, he became a suspect in the fuel's disappearance. Carl High, the District Chief for Maintenance and Operations/Public Facilities, Highways and Aviation Division, contacted Charlotte Mushat, a Human Resource Specialist in the Department of Administration. Mushat organized a pre-determination hearing for August 7, 2006, at which Smith and a union representative would be present.

At the hearing, Smith admitted taking the fuel tank stand but claimed that he thought he had received permission from Griglione. Because of unresolved issues, a second meeting was scheduled for August 17. At the second meeting, Mushat asked Smith for his permission to test his personal fuel tanks to see whether they contained any traces of the missing fuel. Mushat explained that this test would have to occur immediately after the hearing. Smith's union representative, William Meers, recommended that Smith allow this testing, but Smith did not agree to Mushat's proposal. Smith stated that he would permit testing only if it were handled by state troopers. When the State declined to involve state troopers, Smith refused testing. Later in the meeting, Smith offered to have one 100–gallon tank that had been on the back of his truck tested. The State declined this offer, as Smith had admitted recently emptying and repainting that tank. Smith offered to take a polygraph test and asked DOTPF to have the state troopers investigate because they were "impartial."

After the hearing, because Smith had admitted taking the fuel tank stand and because Mushat "was convinced he had stolen the fuel," Mushat recommended to Jack Fullerton, the Maintenance Chief, that Smith be dismissed. Fullerton approved the dismissal and authorized Mushat to draft a termination letter for his signature. The letter, dated August 24, 2006, stated that "[f]indings conclude that you [Smith] purposely and covertly removed the fuel tank and the diesel fuel from state-owned property for your own personal use." Smith was dismissed based on his "past disciplinary record and the gross dishonesty of [his] actions that are evident in the July incident."

Smith filed a grievance on August 31 under his union's collective bargaining agreement. Meers, the union representative who had also been present at Smith's hearings, forwarded this grievance to Judy Porter, a Senior Management Consultant at DOTPF, on September 13, 2006. Porter, in a letter prepared and signed by Mushat, denied the grievance, explaining that "[d]ismissal was both warranted and correct in light of Mr. Smith's gross misconduct, previous discipline record and gross dishonesty of his actions in the July incident." On November 22, 2006, Meers, the union representative, sent Smith a letter stating that there was "not substance enough" to warrant pursuing the grievance further and that Smith's grievance had been withdrawn.

## B. Discrimination Claim And Lawsuit

Smith filed a complaint for discrimination with the Alaska State Commission for Human Rights, as well as a charge of discrimination with the United States Equal Employment Opportunity Commission (EEOC). In his complaint Smith alleged racial discrimination because he is an Alaska Native. Mushat replied with a letter denying that any discrimination had taken place and asserting that Smith had been dismissed because of his theft and dishonesty. The EEOC rejected Smith's complaint and closed its file on January 30, 2008, stating that it was "unable to conclude that the information obtained establishes violations of the statutes." [1]

Smith filed this lawsuit on April 25, 2008. In his complaint, Smith alleged several causes of action: (1) discrimination, (2) interference with contractual relations, (3) intentional infliction of emotional distress, and (4) breach of the implied covenant of good faith and fair dealing. The State responded on May 27, 2008, denying Smith's allegations.

Smith pointed to three incidents to substantiate his claims. First, he claimed that his superior accused him of faking injuries. Smith's immediate superior was Ken Bartlett; Superintendent Carl High was the supervisor who was a level above Bartlett. According to Smith, in 2005 High made a comment that Smith was faking injuries. Second, Smith pointed to a rumor he heard that, after Smith had been fired, High told the crew at the Quartz Creek Station that "we finally got rid of that lazy Indian SOB." Smith claimed he was told of this remark by someone who was not actually present but who had heard about the remark. Smith could not recall the name of the person who told him about the rumor. Third, Smith alleged that he was given less desirable work assignments based on a discriminatory motive.

On March 9, 2009, eleven months after Smith filed his complaint and three months before trial was scheduled to begin, the State filed a motion for summary judgment on all of Smith's claims. The superior court granted summary judgment on all counts.

## III. STANDARD OF REVIEW

We will affirm a lower court's grant of summary judgment if the evidence in the record presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[2] We review a superior court's grant of summary judgment de novo.[3] In deciding whether this burden has been met, we will "consider the affida-

---

1. The record before us does not contain the State Commission's resolution of Smith's claim.

2. *Anderson v. Alyeska Pipeline Serv. Co.*, 234 P.3d 1282, 1286 (Alaska 2010).

3. *Peterson v. State, Dep't of Natural Res.*, 236 P.3d 355, 361 (Alaska 2010).

vits, depositions, admissions, answers to interrogatories and similar material to determine ... whether any of the [evidentiary] material suggests the existence of any ... triable genuine issues of material fact." [4]

## IV. DISCUSSION

### A. Waiver

■ Smith's complaint lists four claims for relief. The first is based on discrimination. There are actually two components to Smith's first claim: a claim for hostile working environment and a claim for discriminatory termination. Smith's second claim for relief is for tortious interference with contractual relations. The third is a claim for intentional infliction of emotional distress. The fourth is a claim for a breach of the implied covenant of good faith and fair dealing. Smith's statement of points on appeal raises a challenge to the superior court's grant of summary judgment on all four claims, but his brief discusses only two of them.

We have explained that "[f]ailure to argue a point [of law] constitutes an abandonment of it." [5] More specifically, we have held that "[w]hen, in the argument portion of a brief, a major point has been given no more than cursory statement, we will not consider it further." [6] The argument portion of Smith's brief contains three sections: (1) "There Were Genuine Issues of Material Fact"; (2) "Smith Made A Prima Facie Case of Racial Discrimination"; and (3) "The State Breached The Covenant Of Good Faith And Fair Dealing." The first section argues generally that summary judgment should seldom be granted. The second section discusses Smith's discriminatory termination claim. The third section restates the allegation that the State breached the implied covenant of good faith and fair dealing by wrongfully terminating Smith and by racially discriminating against him.

Because Smith's brief does not discuss his claims for interference with contractual relations or his claim for intentional infliction of emotional distress, we do not address them. Additionally, though Smith's complaint alleged discrimination "on the basis of race, national origin, and physical disability," Smith's brief only discusses discrimination on the basis of his status as an Alaska Native and does not address the claim for discrimination based on disability.[7] We therefore confine our review to the claims of error discussed in Smith's brief.[8]

### B. Discrimination

■ Smith alleges that he was terminated because of discriminatory animus. The Alaska Human Rights Act, codified at AS 18.80.220, prohibits an employer from discriminating against a person in a "term, condition, or privilege of employment because of

---

4. *Broderick v. King's Way*, 808 P.2d 1211, 1215 (Alaska 1991) (quoting *Walker v. White*, 618 P.2d 561, 563 (Alaska 1980)). Alaska Civil Rule 56(c) provides that "[j]udgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law."

5. *State v. O'Neill Investigations, Inc.*, 609 P.2d 520, 528 (Alaska 1980).

6. *Id.*

7. Federal courts have held that Native Americans are protected both by Title VII's prohibition of discrimination on the basis of race and by its prohibition of discrimination on the basis of national origin. Barbara T. Lindemann, Paul Grossman & C. Geoffrey Weirich, 1 Employment Discrimination Law 340 (4th. ed. 2007) ("Native Americans working for nontribal employers outside the tribal reservation or property are protected under Title VII from discrimination on the basis of national origin.... Some courts have also held that Native Americans are protected from race discrimination under ... Title VII."). When applying the Alaska Human Rights Act, we have generally treated discrimination against Native Americans as a matter of racial discrimination. *See Miller v. Safeway, Inc.*, 102 P.3d 282, 291 (Alaska 2004).

8. *Union Oil v. State, Dep't of Revenue*, 677 P.2d 1256, 1259 n. 6 (Alaska 1984) (noting that issues included in a statement of points on appeal but not discussed in appellant's brief are considered abandoned); *see also Wetzler v. Wetzler*, 570 P.2d 741, 742 n. 2 (Alaska 1977) ("[We] consider as abandoned questions set forth in the Points but not argued in [appellant's] brief.").

the person's race." [9]  We have recognized a private cause of action under AS 18.80.220.[10] Title VII of the Civil Rights Act of 1964 similarly prohibits discrimination against any individual with respect to the "terms, conditions, or privileges of employment, because of such individual's race." [11]  Enforcement of Title VII must begin through an administrative filing with the EEOC; if the EEOC declines to pursue the complaint, the complainant can seek relief judicially.[12] Smith met this requirement by filing his lawsuit within 90 days of the notice that the EEOC had rejected his claim.[13]

■ To determine whether an employment action was discriminatory, we have adopted a three-part test:

> Because it is usually impossible for an employee to prove that the actions of an employer were motivated by discriminatory intent, we have adopted the three-part pretext analysis that involves a series of shifting burdens for claims of employment discrimination where there is no direct evidence of discriminatory intent, known as the *McDonnell Douglas* test.[14]

First, the employee must establish a prima facie case of discriminatory treatment.[15] Second, the burden shifts, and the employer must offer a legitimate nondiscriminatory reason for its action.[16]  Third, the burden shifts again, and the employee has the burden of proving that this reason was pretextual.[17]

■ There are four elements to a prima facie case of employment discrimination. The plaintiff must show that (1) the plaintiff was a member of a protected class under the statute; (2) the plaintiff was qualified for the job; (3) the plaintiff was adversely affected by an employment decision despite those qualifications; and (4) others, not within the protected class, were treated more favorably.[18]  Smith does not meet this initial burden.  He does belong to a protected class of Native Americans, satisfying the first element.  As to the second element, Smith has asserted his own qualifications in a deposition, but he has not provided performance reviews or other materials to corroborate that claim.  The State argues that Smith's theft rendered him unqualified for his job. But the State also has not presented performance reviews or other assessments of Smith's qualifications prior to the time of his alleged theft.  Accordingly, there remain genuine issues of material fact as to Smith's qualifications.  Smith satisfies the third element because he was adversely affected by the termination decision.  But Smith fails to satisfy the fourth element of the prima facie test because he cannot demonstrate that employees outside his protected class were treated more favorably.  Smith's replacement was also an Alaska Native.  And in 2003 DOTPF dismissed a white male employee for a theft similar to Smith's.  Because Smith cannot meet the first part of the three-part *McDonnell Douglas* test, we need not examine the second and third parts.

## C.  Breach Of The Implied Covenant Of Good Faith And Fair Dealing

■ Smith claims that DOTPF breached the covenant of good faith and fair dealing that is implied in all contracts in Alaska.[19] This covenant has a subjective and objective

9.   AS 18.80.220(a)(1).

10.   *Ratcliff v. Security Nat'l Bank,* 670 P.2d 1139, 1142 (Alaska 1983); *Loomis v. Schaefer,* 549 P.2d 1341, 1343 (Alaska 1976).

11.   42 U.S.C. § 2000e–2(a)(1) (2006).

12.   *See generally National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

13.   42 U.S.C. § 2000e–16(c) (2006).

14.   *Peterson v. State, Dep't of Natural Res.,* 236 P.3d 355, 364 (Alaska 2010) (internal quotation marks omitted); *see also Brown v. Wood,* 575 P.2d 760, 770 (Alaska 1978) (adopting the test used in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

15.   *Peterson,* 236 P.3d at 364.

16.   *Id.* at 365.

17.   *Id.*

18.   *Miller v. Safeway,* 102 P.3d 282, 291 (Alaska 2004).

19.   *Casey v. Semco Energy, Inc.,* 92 P.3d 379, 384 (Alaska 2004).

component: "A party must act in subjective good faith, meaning that it cannot act to deprive the other party of the explicit benefits of the contract, and in objective good faith, which consists of acting in a manner that a reasonable person would regard as fair."[20] The subjective prong examines the employer's motives. The employer may take an action that is otherwise legitimate but violates the covenant if the action is meant to deprive the employee of contractual benefits.[21] For example, in *Mitford v. de Lasala*, we held that an employer violated the implied covenant when it discharged an employee in order to prevent him from collecting on a profit-sharing program.[22] The objective prong tests whether the employer's conduct was objectively fair: "Disparate employee treatment, terminations on unconstitutional grounds, and firings that violate public policy are examples of actions that may violate the objective aspect of the implied covenant."[23]

Smith argues that DOTPF breached the implied covenant by racially discriminating against him and by falsely accusing him of theft. We have already addressed the merits of Smith's claim that he was racially discriminated against. Smith has not established a prima facie case of racial discrimination; therefore, he cannot claim that DOTPF breached the implied covenant of good faith and fair dealing by racially discriminating against him. As to the accusations of theft,

Smith admitted taking the fuel tank stand. There was no "false accusation," and Smith does not contest that this was an adequate ground to terminate him. DOTPF did accuse Smith of taking 100 gallons of fuel, but Smith has offered no evidence that DOTPF's investigation was unfair. Indeed, DOTPF offered to test Smith's personal fuel tanks, a test that presumably would have exonerated Smith if he was innocent. Even if DOTPF was in fact mistaken about the theft of the fuel, Smith does not adduce facts reasonably permitting an inference that DOTPF's investigation was unfair or conducted in bad faith. In *Holland v. Union Oil*, we explained that an employee's "mere denial of any wrongdoing is insufficient in and of itself to avoid summary judgment on his claim."[24] Accordingly, there are no genuine issues of material fact as to whether DOTPF breached the implied covenant of good faith and fair dealing.

## V. CONCLUSION

We AFFIRM the superior court's order granting summary judgment.

---

**20.** *Id.*

**21.** *Ramsey v. City of Sand Point*, 936 P.2d 126, 133 (Alaska 1997).

**22.** 666 P.2d 1000, 1007 (Alaska 1983).

**23.** *Pitka v. Interior Reg'l Hous. Auth.*, 54 P.3d 785, 789 (Alaska 2002). It should be noted that, while the question whether the implied covenant was breached is a question of fact, trial courts can award judgment as a matter of law on these claims. *See Holland v. Union Oil Co. of Califor-*

*nia, Inc.*, 993 P.2d 1026, 1032–33 (Alaska 1999) ("We have held that whether an employer breached the covenant of good faith and fair dealing is usually a question for the trier of fact. We have not held, however, that we could never conclude that as a matter of law an employer did not breach the implied covenant of good faith and fair dealing when it demoted an employee.").

**24.** 993 P.2d at 1036.