**PYRAMID PRINTING COMPANY,**
Appellant,

v.

**ALASKA STATE COMMISSION FOR HUMAN RIGHTS, Paula M. Haley, Executive Director, ex rel. Debra A. Tiernan,**
Appellee.

No. S–12046.

Supreme Court of Alaska.

March 16, 2007.

Sean Halloran, Hartig Rhodes Hoge & Lekishch, P.C., Anchorage, for Appellant.

William E. Milks, Assistant Attorney General, and David W. Márquez, Attorney General, Juneau, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

This is an appeal from the award and order in a sexual harassment case decided by the Alaska State Commission for Human Rights. The employer appeals the commission's decision, arguing that the award should be reduced since the employee should have mitigated her damages by accepting the employer's offer of re-employment, the commission should not have included vacation pay in the employee's backpay award, and the commission applied the incorrect interest rate on the award. The employer also appeals from the commission's order that the corporation's owners undergo sexual harassment training. We affirm the commission's award of backpay and vacation pay, as well as its order for sexual harassment training. However, because we believe the commission applied the incorrect interest rate to the award, we vacate that portion of the order and remand to the commission to recalculate the award amount using a reasonable rate of interest.

## II. FACTS AND PROCEEDINGS

Debra Tiernan worked for Pyramid Printing Company, an Anchorage corporation, from September 1995 to December 1998. At the time Tiernan worked there, Don and Francine Pintar each owned fifty percent of the stock of the corporation. Don, who was president of the corporation at the time, spent a couple of days each week there paying bills, filing invoices, and conducting other administrative tasks. Francine, who was ill, did not take an active role in the business at the time Tiernan worked for Pyramid, although she advised Don on business decisions. The Pintars' son Kirk worked as Pyramid's general manager and was Tiernan's direct supervisor. Pyramid is a small business with limited facilities and fewer than ten employees. Tiernan was the only female employee during her tenure there.

It is undisputed that on several occasions during Tiernan's three years at Pyramid, Kirk touched her in an unwelcome and inappropriate manner, called her at home outside of working hours on subjects unrelated to her employment, suggested that Tiernan have a sexual relationship with him, and acted in a jealous and violent manner (such as throwing coffee cups against walls, breaking a door off its hinges, and overturning a table). After a particularly difficult episode in December 1998, Tiernan quit her job. Shortly afterwards, she filed a claim with the Alaska Department of Labor, listing sexual harassment as her reason for leaving. When Don learned of the sexual harassment allegation, he called Tiernan, asked her what he could do to fix the situation, and offered to pay her unemployment benefits. Tiernan declined Don's offer and refused to discuss the case with him.

The Department of Labor held two days of hearings, the first in January 1999, and the second in February 1999. Soon after the first day of hearings, the Pintars, on behalf of Pyramid, sent Tiernan a letter inviting her to return to her job. The letter, dated February 5, 1999, stated in part:

> If she wishes, Ms. Tiernan is welcome to return to her job at the same wage she was receiving when she quit. If she elects to accept this offer and return to her job, Pyramid will ensure that she will no longer have to report directly to her former supervisor. She will not have to work alone with him, and work related contact with him will be minimized to the extent feasible. In keeping with Pyramid's long standing policy of providing the best possible working environment to its employees, Pyramid will work to ensure that Ms. Tiernan is not subjected to harassment or discrimination on the job.

Tiernan rejected the offer of re-employment. As her attorney explained in a letter of response:

> Ms. Tiernan rejected the offer to return to work at Pyramid Printing because: (1) it was not a practical remedy to the problem, i.e., she would still be working in a small shop run by Kirk Pintar; (2) Kirk Pintar is violent and sexually obsessed with Ms. Tiernan; (3) Ms. Tiernan would be under constant stress and in constant apprehension of additional violent outbursts and sexual harassment by Kirk Pintar; (4) Ms. Tiernan has experienced a dramatic improvement in her emotional well being since leaving Pyramid; (5) it would be untenable for Ms. Tiernan to work at Pyramid while she seeks monetary compensation for her damages from the Pintars; and (6) she does not believe the offer was made in good faith.

The Department of Labor denied Tiernan's benefits claim, finding that she voluntarily left the job without good cause. The department stated that, although Tiernan "was subject to inappropriate behavior by her supervisor," she failed to properly bring her grievance to the attention of her employer.

Upon receiving the department's final decision, Tiernan submitted a claim to the Human Rights Commission. The commission conducted five days of hearings in August 2002, and it concluded that Kirk had subjected Tiernan to sexual harassment sufficiently severe to create a hostile work environment, that the harassment was both objectively and subjectively objectionable, and that Tiernan was justified in quitting her job.

Upon establishing liability, the commission awarded Tiernan damages for lost wages, including back pay, vacation pay, and yearly bonuses; the award totaled $50,972. Contrary to Pyramid's argument, the commission determined that Tiernan reasonably rejected the written offer of re-employment. The commission found that Pyramid's offer had been made conditionally, based on Francine's testimony that Tiernan needed to " 'clean up' her act." The commission alternatively concluded that, even if the offer was unconditional, Tiernan acted reasonably in refusing it because she risked continued harassment: "[Tiernan] had reason to believe that she would be subjected to the same conditions that were present which caused her to leave." The commission also noted that Tiernan sought to mitigate her damages by seeking a new job after leaving Pyramid and by starting her own label company.

The commission awarded Tiernan pre- and post-judgment interest "at the statutory rate of 10.5%." Finally, the commission ordered Pyramid to adopt written policies on discrimination in the workplace and to provide annual training to its employees, managers, and owners in the areas of sexual harassment, sex discrimination, and the Alaska Human Rights Act.

Pyramid appealed the decision to the superior court. Superior Court Judge Dan A. Hensley affirmed the commission's decision. Pyramid appeals.

### III. STANDARD OF REVIEW

When the superior court acts as an intermediate court of appeal from an agency decision we review the agency deci-

sion directly.[1] Whether or not an employee's refusal to accept a job offer is reasonable is generally a question of fact.[2] A determination of fact by the Human Rights Commission will stand if it is supported by substantial evidence.[3] Whether an agency has complied with statutory requirements is a question of law.[4] We apply the reasonable basis standard of review to questions of law involving agency expertise, and the substitution of judgment standard to questions outside the agency's expertise.[5]

## IV. DISCUSSION

### A. The Commission Did Not Err in Awarding Tiernan Lost Wages After She Refused Pyramid's Re–Employment Offer.

■ According to Pyramid, "[t]here are no facts that support the Commission's finding [that Tiernan's rejection of the re-employment offer was reasonable], and Ms. Tiernan is not entitled to receive any damages for the period from February 12, 1999 forward." Pyramid argues that its letter of February 5, 1999 contained an unconditional and reasonable offer of re-employment to Tiernan which she should have accepted in order to mitigate her damages. We hold that the commission's decision that Tiernan acted reasonably when she refused to accept the offer was supported by substantial evidence. Because we affirm the commission's decision on this ground, we do not reach the question of whether the offer was unconditional.

In order to determine whether substantial evidence supported the commission's conclusion that Tiernan acted reasonably when she refused the offer of reinstatement, it is necessary to consider the context of this dispute. Pyramid has not appealed the commission's finding that Tiernan was subjected to sexual harassment by Kirk, or that Kirk created a hostile working environment "in the form of unwelcome, inappropriate touching, suggestions that they have a sexual relationship, acting in a jealous manner whenever other males interacted with her, [and] throwing objects." Pyramid's offer of reinstatement assured Tiernan only that she would not have to report directly to Kirk or work alone with him, and that her contact with him would be minimized "to the extent feasible."[6] But substantial evidence supports the commission's conclusion that this promise to minimize contact was unrealistic and that "Tiernan had reason to believe that she would be subjected to the same conditions that ... caused her to leave. Kirk managed the business and ran the day-to-day operations, making it highly impractical, if not completely impossible, to minimize contact or Kirk's supervisory role. Tiernan expressed her apprehension about returning to work for Pyramid when she testified, 'I decided I wasn't going to go back anymore because I didn't want to subject myself to that behavior anymore.... [W]hen was it going to escalate into him slamming me through a wall or something?'"

■ While an employee generally has an obligation to mitigate damages by making

1. *Garner v. State, Dep't of Health & Soc. Servs., Div. of Med. Assistance,* 63 P.3d 264, 267 (Alaska 2003); *Matanuska Elec. Ass'n, Inc. v. Chugach Elec. Ass'n, Inc.,* 53 P.3d 578, 583 (Alaska 2002).

2. RESTATEMENT (SECOND) OF AGENCY § 455 cmt. d (1958). *Gates v. City of Tenakee Springs,* 822 P.2d 455, 460 (Alaska 1991) ("[W]hether efforts [to mitigate damages] were reasonable or potential risk and expense were undue are questions of fact for the trial court."); *West v. Whitney–Fidalgo Seafoods, Inc.,* 628 P.2d 10, 18 (Alaska 1981) ("What is a reasonable effort [to mitigate damages] is a question of fact....").

3. *Alaska USA Fed. Credit Union v. Fridriksson,* 642 P.2d 804, 808 (Alaska 1982) (citing *Alaska State Comm'n for Human Rights v. Yellow Cab,* 611 P.2d 487, 490 (Alaska 1980)).

4. *Allen v. State, Oil & Gas Comm'n,* 147 P.3d 664, 667 (Alaska 2006).

5. *Leigh v. Seekins Ford,* 136 P.3d 214, 216 (Alaska 2006).

6. Pyramid suggests in its briefing to this court that Tiernan knew Kirk was ready to resign if she would agree to come back to work. However, the record does not indicate that Tiernan was informed of Kirk's purported offer to resign at any time before the commission hearings in August 2002. Kirk's offer of resignation, which he apparently made to his parents, was not part of the offer made to Tiernan.

a reasonable effort to secure suitable alternative employment, that obligation does not extend to employment that would create "embarrassment or hardship."[7] "An employee is not obligated to accept proffered employment if it involves an increase in danger or discomfort vis-a-vis the promised position, or if acceptance of the employment would involve humiliation or degradation...."[8]

 Constructive discharge occurs "[w]here an employer makes working conditions so intolerable" that "a reasonable person in the employee's position would have felt compelled to resign."[9] Where an employee has been subjected to intolerable working conditions, it follows that reinstatement to unchanged conditions—conditions so intolerable that a reasonable person would resign rather than endure them—would involve danger, degradation, discomfort, or humiliation. Thus, where a constructively discharged employee reasonably believes that the intolerable conditions have not changed, the duty to mitigate does not require that the employee accept a reinstatement offer.[10]

Here, the commission concluded that Tiernan was constructively discharged and "had reason to believe that she would be subjected to the same conditions that were present which caused her to leave." Substantial evidence supports this conclusion. Given Tiernan's reasonable belief that the intolerable conditions had not changed, she was not obligated to accept re-employment in order to mitigate her damages. Thus, the commission did not err in awarding her lost wages.

## B. The Commission Did Not Err in Including Vacation Pay in the Lost Wages Award.

 Tiernan's award included a yearly bonus and two weeks' vacation pay per year. Pyramid argues that the commission's award of vacation pay amounts to double recovery for time that Tiernan would have spent on vacation had she still worked at Pyramid, and thus constitutes error. Pyramid also argues that Tiernan "voluntarily remained outside the workforce after leaving Pyramid's employment, [and therefore] she should not be permitted to assert an entitlement to pay over and above compensation for each and every week of the year even if such payments were permitted under Pyramid's vacat[ ]ion policies." Pyramid does not cite any authority for this argument, which we reject.

 An employee earns her vacation

---

7. *Univ. of Alaska v. Chauvin*, 521 P.2d 1234, 1240 (Alaska 1974).

8. *Id.* at 1240 n. 22 (citing RESTATEMENT (SECOND) OF AGENCY § 455 cmt. d at 373).

9. *Cameron v. Beard*, 864 P.2d 538, 547 (Alaska 1994).

10. Several federal courts have reached similar conclusions in the Title VII and ADEA contexts. *See, e.g., Smith v. World Ins. Co.*, 38 F.3d 1456, 1464 (8th Cir.1994) (holding that based on the totality of circumstances, including employee's discomfort with employment offer and belief that conditions at workplace had not changed, constructively discharged employee reasonably rejected an offer of reinstatement); *Lewis v. Fed. Prison Indus., Inc.*, 953 F.2d 1277, 1279 (11th Cir.1992) (where evidence showed plaintiff could not return to former discriminatory work environment without facing increase in symptoms of depression court satisfied plaintiff's rejection of offer of reinstatement reasonable); *Wilcox v. Stratton Lumber*, 921 F.Supp. 837, 843 (D.Me. 1996) (holding employee who prevailed on sexual harassment claim reasonably declined reinstatement where she had "doubts that the work environment ... had changed" and "feared continued harassment"); *Naylor v. Georgia–Pacific Corp.*, 875 F.Supp. 564, 582 (N.D.Iowa 1995) (holding that "reasonable concern of continued harassment" may constitute an exception to employee's duty to mitigate by accepting reinstatement); *Maturo v. Nat'l Graphics, Inc.*, 722 F.Supp. 916, 927 (D.Conn.1989) (holding that constructively discharged employee reasonably rejected reinstatement where she had been "subjected to a long history of harassment" by someone "with whom plaintiff, given the relatively small workforce [at the employer] would undoubtedly come in contact [with] on a recurring basis if she returned"). *But see Robles v. Cox & Co., Inc.*, 154 F.Supp.2d 795, 807 (S.D.N.Y.2001) (where employer gave assurances returning employee would not be subject to further harassment and plaintiff presented no evidence that assurances were insincere, plaintiff's assertions that returning to work would cause her metal anguish insufficient to create genuine issue of material fact as to reasonableness of her rejection of offer).

pay through her labor.[11] "It is established that vacation pay is not a gratuity or a gift, but is, in effect, additional wages for services performed." [12] The consideration for vacation with pay is the employee's year-long labor.[13] As Judge Augustus Hand wrote in explaining employees' rights to vacation pay under a collective bargaining agreement, "A vacation with pay is in effect additional wages. It involves a reasonable arrangement to secure the well being of employees and the continuance of harmonious relations between employer and employee." [14] Vacation pay "is simply an alternate form of wages, earned at the time of other wages, but whose receipt is delayed." [15] Accordingly, the commission properly awarded Tiernan the vacation pay she had earned through her employment at Pyramid.

Moreover, we note that under AS 18.80.130(a)(1) the commission has broad discretion to "order any appropriate relief" to remedy employment discrimination. The ability to award Tiernan vacation pay clearly falls within the commission's power.

### C. The Commission Did Not Err in Ordering Pyramid's Owners To Undergo Sexual Harassment Training.

The commission ordered Pyramid to provide at least six hours of training to its owners, managers, and employees to address prevention of sexual harassment and sex discrimination and to promote greater understanding of the Alaska Human Rights Law to its "employees, managers, and owners." Pyramid objects to the inclusion of owners in this order, arguing that the commission cannot pierce the corporate veil in order to hold the shareholder owners of the corporation accountable.

Piercing the corporate veil is not relevant to this case. The doctrine of piercing the corporate veil is an exception to the principles that the corporation exists as a separate legal entity and that owner liability for the debts of the corporation is limited.[16] "Piercing the corporate veil is a means of assessing liability for the acts of a corporation against the equity holder in the corporation." [17] The doctrine of corporate veil-piercing "applies only to plaintiffs who seek recovery against the personal assets of corporate shareholders or directors." [18] Here, however, there is no effort to get at shareholder assets; rather, the question is whether the shareholders—two owners, in fact—are amenable to a remedial order. The commission has been granted broad remedial powers to order "any legal or equitable relief which is reasonably calculated to prevent future violations of a similar nature." [19]

---

**11.** *See, e.g., Langager v. Crazy Creek Prods., Inc.,* 287 Mont. 445, 954 P.2d 1169, 1175 (1998) ("[V]acation pay is earned by virtue of an employee's labor and once it has accrued, it has by definition been earned.").

**12.** *Suastez v. Plastic Dress–Up Co.,* 31 Cal.3d 774, 183 Cal.Rptr. 846, 647 P.2d 122, 125 (1982).

**13.** *Id.*

**14.** *In re Wil–Low Cafeterias,* 111 F.2d 429, 432 (2d Cir.1940).

**15.** *Suastez,* 183 Cal.Rptr. 846, 647 P.2d at 125 (quoting *Local Union No. 186, United Packinghouse Food & Allied Workers v. Armour & Co.,* 446 F.2d 610, 612 (6th Cir.1971)).

**16.** *See, e.g., Dole Food Co. v. Patrickson,* 538 U.S. 468, 475, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003); *Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.,* 234 B.R. 293, 321–22 (1999); *Morris v. State, Dep't of Taxation & Fin.,* 82 N.Y.2d 135, 603 N.Y.S.2d 807, 623 N.E.2d 1157, 1160 (1993).

**17.** *Village at Camelback Prop. Owners Ass'n, Inc. v. Carr,* 371 Pa.Super. 452, 538 A.2d 528, 532 (1990). *See also* 1 FLETCHER CYCLOPEDIA OF CORPORATIONS § 41.10, at 578 (1999) ("An attempt to pierce the corporate veil is a means of imposing liability on an underlying cause of action, such as tort or breach of contract.").

**18.** *Leo Eisenberg & Co., Inc. v. Payson,* 162 Ariz. 529, 785 P.2d 49, 54 (1989). *See also* 1 FLETCHER CYCLOPEDIA OF CORPORATIONS § 41.20, at 589–90 ("[C]ourts pierce the corporation veil for the purpose of adjudging the rights and liabilities of parties in the case.").

**19.** 6 AAC 30.480(b). Additionally, the legislature has recently amended AS 18.80.130 to specifically include "training of an employer, labor organization, or employment agency, and its employees concerning discriminatory practice" within the scope of appropriate relief. Ch. 63, § 4, SLA 2006.

Given Don and Francine's somewhat blurred roles as owners and managers of the company, the breadth of the order seems appropriate.[20] As Tiernan points out, Don and Francine are not only Pyramid's owners but also its managers. Consequently, they had the power to dictate terms and conditions of employment. Tiernan's point is well-supported by the record. When Tiernan left her job in December 1998, Pyramid's only stockholders were Don and Francine Pintar. The record shows several instances of Don and Francine participating in management decisions, including Don's internal investigation of Tiernan's claim; Don and Francine's regular discussions of business decisions; and the fact that both Don and Francine authorized the letter offering re-employment to Tiernan.

The commission did not err in ordering Pyramid's owners, including Don and Francine, to attend sexual harassment training.

### D. The Commission Erred in Applying 10.5 Percent Interest to the Award.

Pyramid argues that the commission erred in requiring it to pay pre- and post-judgment interest at a rate of 10.5 percent. We agree.

Tiernan contends that the administrative regulation which provides for the commission's remedial authority, former 6 AAC 30.480(b), was still in force when she left Pyramid in 1998 and thus the award of interest at 10.5% was proper. Under the former version of 6 AAC 30.480(b)[21] in effect as of the time of the commission's 2003 order, the commission had the authority to award pre-judgment interest at the rate of 10.5%. The commission presumably relied on the language of this regulation when awarding Tiernan interest.

Pyramid contends that the commission's reliance on the regulation was in error and that any award of interest should be governed by the statutory rate set forth in Title 9 of the Alaska Statutes. Consequently, Pyramid argues that the rate of interest applicable to Tiernan's award should be the statutory rate in effect in August 2003: 3.75%.[22]

 We reject Pyramid's argument that Title 9 is applicable to the commission's award. Title 9 by its very definition applies to judicial "actions."[23] Alaska Statute 09.30.070(a) is plainly limited to "judgments" and "decrees." Nothing in the language of Title 9 indicates it applied to administrative proceedings such as this one. But rejection of Pyramid's argument does not inevitably lead to acceptance of Tiernan's approach.

The regulation in effect as of the date of the 2003 order granted the commission broad remedial authority to order relief "which is reasonably calculated to prevent future violations of a similar nature or which *reasonably compensates* the complainant [ ] for losses incurred."[24] It then provides that "A monetary award under this section will, *in the commission's discretion*, include an order

---

20. In its reply brief, Pyramid states that Don and Francine are no longer the owners of the corporation and accordingly argues that they should not be subject to the order. Pyramid relies on facts outside the record, and thus we will not address its argument. Any request for relief based on corporate changes that occurred during the appeals process should be addressed to the commission upon remand.

21. Former 6 AAC 30.480(b) provides in relevant part:

> The remedial authority of the commission under AS 18.80.130(a) includes the authority to order any legal or equitable relief which is reasonably calculated to prevent future violations of a similar nature or which reasonably compensates the complainant or the class for losses incurred as a result of the unlawful conduct, including out-of-pocket expenses. A monetary award under this section will, in the

commission's discretion, include an order that interest on the amount due be paid from the date of the discriminatory conduct at six percent annually before September 12, 1976, eight percent annually between September 12, 1976 and July 1, 1980, and 10.5 percent annually after July 1, 1980.
In 2004 6AAC 30.480 was amended to require awards of interest to comply with AS 09.30.070.

22. The Alaska Court System has published statutory pre- and post-judgment interest rate data on its web site for all years since 1997. This information is available at *http://www.state.ak.us/courts/int.htm*. In 2003, the rate of interest for judicial actions was 3.75%.

23. AS 09.70.010 states "This title governs all proceedings in actions...."

24. 6 AAC 30.480(b) (emphasis added).

that interest on the amount due be paid from the date of the discriminatory conduct."[25] Thus while the commission clearly had the authority to award interest under the latter provision in subsection (b), any amount so ordered is circumscribed by the preceding provision requiring that any award made "reasonably compensate" the complainant. The commission was therefore required to exercise its discretion in determining an appropriate interest rate that accurately reflected the actual cost of money and thus "reasonably compensated" Tiernan for her lost wages.[26]

Between July 1, 1980 and the date of the commission's decision in Tiernan's case, 6 AAC 30.480(b) provided for an interest rate of 10.5 percent annually. The former version of AS 09.30.070(a) in effect prior to 1997 had similarly provided for an interest rate of 10.5% on judgments.[27] But by 2003 it is clear that this interest rate did not "reasonably compensate[ ]" complainants for losses incurred—it overcompensated them.[28]

■ Because an award of prejudgment interest is intended to compensate a claimant for the lost use of money,[29] any award that provides disproportionate monetary compensation may rightfully be considered punitive in nature.[30] In light of the market forces in play at the time of the commission's award, as indicated by changes to Title 9 and the 2004 amendment to 6 AAC 30.480(b), an interest rate of 10.5% would have disproportionately compensated Tiernan for her lost wages at the time the award was entered. We therefore conclude that the commission abused its discretion in awarding prejudgment interest that exceeded a rate of reasonable compensation.

Because we hold that the commission abused its discretion in awarding interest at a rate of 10.5%, we reverse that portion of the commission's order and remand for recalculation of the award.[31]

## V. CONCLUSION

Because Tiernan was not required to accept Pyramid's offer of re-employment, we AFFIRM the commission's decision to award Tiernan backpay from January 1999 to August 2002. Because Tiernan earned vacation pay as a separate component of her compensation and because an award of vacation pay was well within the commission's power to order any appropriate relief, we AFFIRM the award of vacation pay as a part of the backpay award. Because the commission's broad remedial powers also included the power to order training concern-

**25.** *Id.* (emphasis added).

**26.** *See North Slope Borough v. LeResche,* 581 P.2d 1112, 1115 (Alaska 1978) ("Where, as here, the question is as to the merits of an agency action on matters committed to agency discretion, our scope of review is limited to whether the decision was arbitrary, unreasonable[,] or an abuse of discretion.").

**27.** *Cf. Marine Solution Services Inc. v. Horton,* 70 P.3d 393, 415 (Alaska 2003).

**28.** In 1997 AS 09.30.070(a) was amended to establish a floating prejudgment interest rate dependent on the Federal Reserve discount rate in effect on January 2 of the year in which the judgment or decree is entered. And in 2004, the year following the commission's order in this case, 6 AAC 30.480(b) was amended to ensure that the regulation's interest rates tracked the statutory floating rate set forth in Title 9. The amendment to 6 AAC 30.480(b) provided: "A monetary award under this section may include an order that interest on the amount due be paid as provided in AS 09.30.070(a)." These changes were effectuated to ensure prejudgment interest rates would track the cost of money and more accurately reflect market forces. *See* § 18 and 55 ch 26 SLA 1997.

**29.** *Liimatta v. Vest,* 45 P.3d 310, 322 n. 44·(Alaska 2002).

**30.** *See Cool Homes, Inc. v. Fairbanks North Star Borough,* 860 P.2d 1248, 1257 (Alaska 1993) ("Interest, however, is not punitive. Rather, it is intended to compensate the party to whom the sum is owed for the period of non-payment.").

**31.** On remand, the commission is free to adopt any reasonable rate of interest, including the 12th Federal Reserve District discount rate augmented by a reasonable amount to reflect market reality. On October 1, 2003—the date of the final order issued by the commission—the 12th Federal Reserve District discount rate was 0.75%, and the statutory pre- and post-judgment interest rate in effect was 3.75%. For each of the years for which the commission awarded Tiernan lost wages, the individual statutory yearly interest rates were as follows: 1999 (7.5%), 2000(8%), 2001(9%), 2002 (4.25%), and 2003 (3.75%).

ing sexual harassment, we also AFFIRM the commission's order that Pyramid's owners, employees, and managers undergo sexual harassment training. Finally, because the commission abused its discretion in awarding an excessive rate of interest, we VACATE the award and REMAND this case to the commission to recalculate the award using a reasonable rate of interest.