*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| HARRY ROSS, | ) |
| | ) Supreme Court No. S-16961 |
| Appellant, | ) |
| | ) Superior Court No. 3AN-16-09261 CI |
| v. | ) |
| | ) O P I N I O N |
| ALASKA STATE COMMISSION FOR | ) |
| HUMAN RIGHTS, | ) No. 7405 – August 30, 2019 |
| | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Erin B. Marston, Judge.

Appearances: Mark Choate, Choate Law Firm LLC, Juneau, for Appellant. William E. Milks, Assistant Attorney General, and Jahna Lindemuth, Attorney General, Juneau, for Appellee.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

WINFREE, Justice.

## I. INTRODUCTION

After 36 years of service with the Alaska Railroad Corporation — most of those years as a conductor — an African-American man applied for a newly created managerial trainmaster position, but he was not chosen. He brought an unsuccessful internal racial discrimination complaint. He brought a similar complaint before the

Alaska State Commission for Human Rights, and it was denied. He then appealed to the superior court, and it ultimately affirmed the Commission's determination that he had failed to carry his burden of showing racial discrimination.

On appeal to us, the man contends that the Railroad's stated reasons for not hiring him were pretextual. Although there is some basis for his arguments that a hiring panel member may have harbored racial prejudice and that the explanation that he was not chosen because of poor interview performance was a post-hoc rationalization, we review the Commission's determination only for substantial supporting evidence. Under this deferential standard of review, we conclude that the evidence detracting from the Commission's determination is not dramatically disproportionate to the supporting evidence. Because substantial evidence in the record thus supported the Commission's determination, we affirm the superior court's decision upholding it.

## II.  FACTS AND PROCEEDINGS

### A.  Facts

Harry Ross is an African-American who was hired as a brakeman by the then-federally-owned Railroad in 1968, promoted to conductor around 1974, and promoted to yardmaster in 1982. He testified that when he was a brakeman and conductor, African-American colleagues commonly were referred to by a racial slur and the slur was used in his presence to deride an African-American colleague's performance. Ross asserted that when he was a yardmaster efforts were made to reduce his higher evening-shift pay to increase a white colleague's pay, and an employee — apparently white — he had trained to become a yardmaster later was chosen over him for a higher position.

After three years as a yardmaster, Ross returned to being a conductor in 1985. He testified that he chose to return to the conductor position because of the discrimination he had endured as a yardmaster. Personnel records indicate that when the

federal government transferred the Railroad to the State of Alaska in 1985, his employment terminated; he then was rehired by the State-owned Railroad as a conductor.

Ross still was a conductor in 2004 when he learned the Railroad was hiring for nine new managerial trainmaster positions to be located in Anchorage, Fairbanks, and Talkeetna. The position description listed minimum qualifications of "15 years of train service experience and one year supervising, directing, or being a team leader for train operations personnel." The trainmaster positions were non-union, and length of experience was not determinative. Ross was among 18 candidates selected to interview for the 9 new positions; he sought one of the proposed Anchorage positions. Two candidates were African-American; the rest were white.

A panel of five white Railroad employees interviewed candidates and recommended whom to hire; the recommendations were accepted in their entirety. The hiring panel was supposed to conduct interviews using a questionnaire with 25 graded questions, 3 ungraded questions, and 1 graded item titled "Interview Presentation." Ross responded to a question about his reasons for applying by citing his experience, his desire to increase his pension based on a better "high three" salary years, his enjoyment of working with people, and his wish to better support his new wife. He responded to a question about computer proficiency by stating that his skills were "basic."

The panelists eventually abandoned the grading system because the candidates were not consistently asked the same questions and because panelists did not receive instruction on its proper use. Panelists testified that they instead discussed the candidate's strengths and weaknesses after each interview, and that, in a group discussion after concluding all the interviews, they decided which candidates to recommend. Four panelists made notes about some candidates' interview performance and qualifications; it appears that only one made notes, which were negative, about Ross's performance.

The Railroad made offers to only 7 of 18 applicants, despite recruiting for 9 positions. Two positions were left vacant in Anchorage; neither Ross nor the other African-American candidate was offered a position. Although no successful Anchorage candidate had as long a tenure as Ross, all had been with the Railroad for many years — one for 22 years, two for 29 years, and one for 30 years. The Railroad continued recruiting to fill the vacancies, reducing the minimum required years of experience from 15, when Ross applied, to 5 in 2005.

Ross filed an internal complaint with the Railroad in November 2004, alleging that he was not chosen for a trainmaster position because of his race. The complaint was investigated by Ouida Morrison, the Railroad's African-American equal employment opportunity manager; she reviewed notes panelists made during the interviews and conducted individual interviews with Ross and the panelists.

Two of the panelists — Pat Flynn and Curt Rudd — allegedly had past racially fraught interactions with Ross. Morrison testified to hearing from a colleague that Ross once had remarked that white people look alike and that this remark upset Flynn. Morrison memorialized this account in an email to the Railroad's counsel, concluding that Flynn had "formed an opinion about [Ross] and never let it go." But it does not appear that Flynn was asked about the alleged incident during the subsequent discrimination investigations, and neither Flynn nor the colleague was questioned about it during the Commission's administrative hearing.

Rudd admitted in testimony that he had referred to Ross by the nickname "Black Magic" for the 30 years they had known each other. Rudd testified that the nickname reflected Ross's apparently supernatural ability to turn trains around on schedule and that Ross had adopted the nickname for himself. Rudd further testified that the nickname was never meant to offend Ross and that Rudd ceased using the nickname when Ross objected to it in 2008. Ross denied ever referring to himself as "Black

Magic," which he considered "kind of racist"; he said he felt the nickname was part of an ingrained hostile workplace culture that he had to let pass.

Flynn and Rudd may have played a disproportionate role in deciding whether to hire Ross as trainmaster. Rudd was the Anchorage terminal superintendent and would have been Ross's direct supervisor; Flynn testified that both he and Rudd would supervise trainmasters located in Anchorage. Morrison and the Railroad's Vice President of Operations, who ultimately was responsible for the hiring decisions, testified that Flynn had been designated the lead panelist.

Morrison testified that the panelists told her that when interviewing they focused on candidates' ability to communicate and interact, especially with younger colleagues. Morrison also testified that Ross told her he had been offended when Flynn entered Ross's interview late. Morrison concluded that Ross had performed poorly in the interview and that "he did not relay or sell himself that he was willing and wanting and desiring to do the job." But she never issued a formal determination whether the panel had discriminated against Ross.

In April 2005 Ross filed a complaint with the Commission, claiming that the Railroad discriminated against him in violation of AS 18.80.220(a)(1), prohibiting employment discrimination based on race. The Commission investigator interviewed Ross and the panelists. The investigator issued a two-page determination in March 2007, finding that the Railroad did not offer Ross a trainmaster position because he provided short answers and failed to elaborate during the interviews, did not "sell himself," conveyed that he felt "entitled" to the position, and lacked computer skills. The Commission therefore dismissed Ross's complaint without a hearing.

B.    Proceedings

Ross appealed the Commission's dismissal to the superior court. The superior court issued its first decision in March 2008. The court relied on the

U.S. Supreme Court's three-part *McDonnell Douglas Corp. v. Green* test.[1] We have stated that, absent "direct evidence"[2] of discriminatory intent, the three-part test should be used to analyze discrimination claims.[3] Under the *McDonnell Douglas* framework, the complainant bears the initial burden of establishing a prima facie case of discrimination: membership in a protected class, application to a position for which the

---

[1]     411 U.S. 792 (1973).

[2]     "[T]he term 'direct evidence' refers to the *quantum of proof*; it is not used as an antonym for 'circumstantial evidence.' In order to show direct evidence [of discriminatory intent,] the plaintiff must 'at least offer either direct evidence of prohibited motivation or circumstantial evidence strong enough to be functionally equivalent to direct proof.' " *Smith v. Anchorage Sch. Dist.*, 240 P.3d 834, 840 (Alaska 2010) (emphasis in original) (first quoting *Kinzel v. Discovery Drilling, Inc.*, 93 P.3d 427, 434 (Alaska 2004); then quoting *Mahan v. Arctic Catering, Inc.*, 133 P.3d 655, 662 (Alaska 2006)).

[3]     *See VECO, Inc. v. Rosebrock*, 970 P.2d 906, 918 (Alaska 1999) ("In determining whether an employer has violated [Alaska's Human Rights Act] when there is no direct evidence of discriminatory intent, we have adopted the three-part framework used in Title VII cases."); *Peterson v. State, Dep't of Nat. Res.*, 236 P.3d 355, 364 (Alaska 2010) ("Because it is 'usually impossible' for an employee to prove that the actions of an employer were motivated by discriminatory intent, we have adopted the three-part pretext analysis . . . for claims of employment discrimination where there is no direct evidence of discriminatory intent, known as the *McDonnell Douglas* test.").

If there is "direct evidence" of discriminatory intent in a mixed motive case, we apply the framework from *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), *superseded by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1074. *Era Aviation v. Lindfors*, 17 P.3d 40, 44 (Alaska 2000), *superseded on other grounds by regulation as stated in Moody v. Royal Wolf Lodge*, 339 P.3d 636, 640 (Alaska 2014). Under the *Price Waterhouse* framework for mixed motive cases — those "based on a mixture of legitimate and illegitimate considerations" — if the plaintiff produces direct evidence of discriminatory intent, the burden shifts to the defendant to show that the decision would have been the same absent the influence of discriminatory intent. *Id.* (quoting *VECO*, 970 P.2d at 920-21). Ross argues that the explanations why he was not hired were pretextual; he does not argue that this is a mixed motive case.

complainant was qualified, denial of the application, and hiring of a person not within the same protected class as the complainant.[4] If the complainant establishes a prima facie case, the burden shifts to the employer to offer "legitimate, nondiscriminatory reasons for the employment action."[5] An employer "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus."[6] If the employer offers a legitimate, credible reason for not hiring the complainant, the burden shifts back to the complainant to prove that the reason is pretextual.[7] "[A] complainant may demonstrate pretext 'either directly by persuading the [tribunal] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' "[8]

The superior court distinguished between the amount of evidence needed to prevail under the test at an adjudication and the amount of evidence needed (at that time) to compel an administrative hearing based on an investigation by the Commission.[9]

---

[4]     *Raad v. Alaska State Comm'n for Human Rights*, 86 P.3d 899, 904-05 (Alaska 2004).

[5]     *Id.* at 905.

[6]     *Id*. (quoting *VECO*, 970 P.2d at 919).

[7]     *Id*.

[8]     *Id*. (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

[9]     *See State, Dep't of Fish & Game, Sport Fish Div. v. Meyer*, 906 P.2d 1365, 1375 (Alaska 1995), *superseded on other grounds by statute,* AS 18.80.112(b), *as recognized in Huit v. Ashwater Burns, Inc.*, 372 P.3d 904, 914 n.52 (Alaska 2016). When Ross filed his complaint, the Commission was authorized to dismiss complaints only for lack of substantial evidence; in 2006 the legislature enacted AS 18.80.112(b), (continued...)

A complainant needed only establish a prima facie case and offer facts raising a "genuine dispute about [the employer's] explanation of its decisions" to meet the evidentiary threshold to obtain an administrative hearing.[10]  The court determined Ross had established a prima facie case of discrimination and offered facts raising a genuine dispute about the Railroad's explanation by offering documents the Commission had not addressed because of its limited investigation.  The court therefore ordered the Commission to hold a full evidentiary hearing.

A hearing was held before an administrative law judge (ALJ) in January 2009.  Ross testified to past discrimination at the Railroad, including the common use of racial slurs earlier in his career and a specific instance when he heard a slur used to refer to an African-American colleague.  He also testified to instances when he felt racist and discriminatory behavior had been directed at him.  Ross testified that Rudd's "Black Magic" nickname referred to Ross's race and was offensive.  Ross said that he had been training an apparently white subordinate who was promoted to a position that Ross also had applied for and that he believed the promotion was motivated by discrimination.  Ross testified to being "annoyed" by Flynn's late arrival to the interview, but Ross insisted that it did not affect his performance.  He testified that in his interview he stressed his experience as a yardmaster and his desire to train younger workers.

Each hiring panelist testified, offering accounts of the trainmaster candidates' interviews — Ross's in particular — consistent with the internal and Commission investigations' findings.  Panelists testified that they were looking for candidates to "sell themselves" on why they deserved the position and to demonstrate

---

[9]  (...continued) allowing the Commission to dismiss complaints for prudential reasons. *See Toliver v. Alaska State Comm'n for Human Rights*, 279 P.3d 619, 623 n.3 (Alaska 2012).

[10]  *Meyer*, 906 P.2d at 1375.

an ability to communicate. Panelists testified that Ross gave short responses to questions and failed to elaborate on how his experience qualified him for the trainmaster position, leading some to discount the value of his experience despite knowing his tenure and service as a yardmaster.

Panelists testified that Ross appeared to lean too heavily on his experience, seemingly taking for granted that his experience would guarantee him a position. Flynn testified that this demonstrated a "seniority mentality." Flynn and two others testified that Ross appeared more interested in benefitting from the position — particularly a higher pension — than in benefitting the Railroad.

Three former Railroad employees testified to racism and discrimination at the Railroad. A white former employee testified to a general culture of racial discrimination during his time at the Railroad. An African-American former employee testified to: hearing racial slurs; witnessing, sometime in the 1990s, a white employee use a racial slur when telling Ross not to sit in the same train car; and experiencing discrimination similar to what Ross alleged. Specifically, the former employee testified that when he was a yardmaster in 1993, he interviewed to become a terminal manager — a position with the same duties as yardmaster — and an interviewer accused him of being interested only in earning his "high three." He testified that the interviewer later told him he should not get the raise that came with the promotion, and that another interviewer — possibly Rudd — made a comment to the effect that he was too lazy for the job. He filed a complaint with the Railroad, but it found no discrimination.

Another African-American former employee testified to hearing a colleague describe him to a third person using a racial slur in 2003 after the colleague thought their telephone conversation had ended. He testified that in 2003 or 2004 he had applied for a training program, that he had the most seniority of those who applied, that the employee who was selected had the least seniority, and that selection traditionally had

been based on seniority. The former employee had filed complaints with the Railroad and then the Commission, but both complaints apparently were denied. He later quit.

Witnesses testified that only a handful of African-American employees held management positions at the Railroad around the time of the trainmaster interviews and that none of these positions were in the transportation division. Apparently the only two African-American employees in management in 2004 were Morrison and the administrative support staff supervisor.

The ALJ issued a recommendation to the Commission in July 2009. Applying the second and third prongs of the *McDonnell Douglas* test, the ALJ found that the Railroad had offered a legitimate business reason for its decision, shifting the burden back to Ross to "persuad[e] the [tribunal] that a discriminatory reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence."[11] The ALJ ultimately was not persuaded by Ross's claim that the Railroad's explanation was pretextual.

In response to Ross's argument that use of racial epithets and lack of African-American managers demonstrated a workplace culture denying equal opportunity to African-American employees, the ALJ first concluded that the general use of racial slurs in the workplace was not probative of animus in the specific hiring process for trainmasters. The ALJ then concluded that Rudd's using the nickname "Black Magic" and his involvement in denying the other African-American employee's application for terminal manager may have been relevant, because Rudd participated in the trainmaster hiring process, but that Rudd did not mean "Black Magic" to be derogatory and the hiring decisions were made as a group. The ALJ also concluded that the lack of African-American managers was not probative because it did not indicate the

---

[11]     *Raad*, 86 P.3d at 905 (quoting *Burdine*, 450 U.S. at 256).

Railroad's specific intent in hiring for the trainmaster position and was not placed in a broader statistical context.

In response to Ross's argument that the Railroad's explanation was a post-hoc rationalization facilitated by a flawed hiring process, the ALJ concluded that, although the hiring process was flawed, the explanations the panelists provided were related to the trainmaster position's responsibilities and likely not fabricated. In response to Ross's argument that his not being hired despite having superior qualifications demonstrated discrimination, the ALJ concluded that his tenure and job history were not determinative because the position was non-union and merit based and because of credible testimony that the new trainmaster position and his previous yardmaster position differed. The ALJ further concluded that Ross failed to inform the panel how his relevant experience qualified him to be a trainmaster. The ALJ recommended that the Commission dismiss Ross's complaint because he failed to prove discrimination.

The Commission adopted the ALJ's recommendation, and Ross appealed to the superior court. The court found that the ALJ had failed to adequately scrutinize the hiring panel's reliance on subjective hiring criteria, relying on Ninth Circuit Court of Appeals case law finding such criteria prone to conceal conscious and unconscious discrimination.[12] The court therefore remanded the matter for the ALJ to consider, in light of pertinent Ninth Circuit case law, the panel's use of subjective criteria in the hiring process.

---

[12] The superior court cited the following cases: *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1136-37 (9th Cir. 2003); *Jauregui v. City of Glendale*, 852 F.2d 1128, 1135-36 (9th Cir. 1988); *Atonio v. Wards Cove Packing Co.*, 810 F.2d 1147, 1481 (9th Cir. 1987) (en banc); *Nanty v. Barrows Co.*, 660 F.2d 1327, 1334 (9th Cir. 1981), *overruled on other grounds by O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 760 (9th Cir. 1996).

In April 2014 the ALJ issued a revised recommendation identical in most respects to the previous recommendation, but the ALJ also observed that several white employees who met the minimum qualifications had not been selected and that hearing testimony indicated other candidates had been evaluated based on interview performance. The Commission issued a final order adopting the revised recommendation with little explanation, although one commissioner dissented on the ground that the "interview process was highly subjective and a ready vehicle for unintentional discrimination." The superior court then affirmed the Commission's revised determination. This appeal followed.

## III. STANDARD OF REVIEW

"When a superior court acts as an intermediate appellate court in an administrative matter, 'we independently review the merits of the agency's decision.' "[13] We review a Commission decision for substantial supporting evidence.[14] " '[S]ubstantial evidence[]' . . . is 'such relevant evidence as a reasonable mind might accept as adequate to support' the agency's conclusion."[15] "The substantial evidence test is highly deferential, but we still review the entire record to ensure that the evidence *detracting* from the agency's decision is not *dramatically* disproportionate to the evidence

---

[13] *Pub. Safety Emps. Ass'n, AFSCME Local 803, AFL-CIO v. City of Fairbanks*, 420 P.3d 1243, 1248 (Alaska 2018) (quoting *State, Dep't of Admin., Div. of Ret. & Benefits v. Shea*, 394 P.3d 524, 528-29 (Alaska 2017)).

[14] *Pyramid Printing Co. v. Alaska State Comm'n for Human Rights*, 153 P.3d 994, 998 (Alaska 2007) ("A determination by the Human Rights Commission will stand if it is supported by substantial evidence.").

[15] *Local 803*, 420 P.3d at 1248 (quoting *Shea v. State, Dep't of Admin., Div. of Ret. & Benefits*, 267 P.3d 624, 630 (Alaska 2011)).

supporting it such that we cannot 'conscientiously' find the evidence to be 'substantial.' "[16]

## IV. DISCUSSION

### A. Legal Standard And Scope Of Review

Ross argues that the Railroad's explanation for not selecting him was pretextual. As noted earlier, we apply the three-part *McDonnell Douglas* test to discrimination claims based on pretext if there is no direct evidence of discriminatory intent.[17] Ross and the Railroad agree that the test's first two prongs — a prima facie showing that the employee was qualified but that no member of the employee's race was hired, and the employer's offer of a legitimate business reason for not hiring the employee — have been met. The sole question for us on review is whether substantial evidence supports the Commission's determination that Ross did not satisfy the third prong by showing the offered reasons for not hiring him were a pretext for discrimination. We have noted, when applying a similarly deferential standard of review, that the deferential standard of review may result in a decision we might not have reached were we the initial decision maker.[18]

---

[16] *Id.* (emphasis in original) (quoting *Shea*, 267 P.3d at 634 n.40).

[17] *See VECO, Inc. v. Rosebrock*, 970 P.2d 906, 918 (Alaska 1999); *Peterson v. State, Dep't of Nat. Res.*, 236 P.3d 355, 364 (Alaska 2010).

[18] *See State v. Pub. Safety Emps. Ass'n*, 235 P.3d 197, 202 (Alaska 2010) (stating in appeal of arbitration clearing police officer of multiple allegations of misconduct that "[i]f we were reviewing this case in the first instance, or under a less deferential standard, we likely would not have reached [the same] conclusion").

**B. Substantial Evidence Supporting The Commission's Determination**

**1. Rudd's use of "Black Magic"**

Ross argues that Rudd's use of the nickname "Black Magic" reflects racial animus that, when considered together with flaws in the hiring process and other evidence of discrimination by the Railroad, demonstrates Ross was not hired because of his race. Ross disputes Rudd's testimony that the nickname reflected Ross's magical ability with trains rather than racial prejudice, pointing to the term's negative association with "Satanism and devil-worship." Ross suggests that, even if not explicitly prejudicial, the term's racial reference and connotations should be considered circumstantial evidence of discriminatory intent.

The Railroad responds by invoking the ALJ's conclusion that Rudd credibly testified he had not intended "Black Magic" to be derogatory based on widespread use of nicknames in the railyard and his ceasing use of the nickname when Ross asked. The Railroad concedes that "Black Magic" may be considered circumstantial evidence of discriminatory intent along with other evidence, but it concludes that, even so, it would not make unreasonable the ALJ's finding that Ross was not denied the trainmaster position because of discrimination.

The ALJ found that "[b]ased on the testimony, the use of th[e] name, while racial, was not intended to be derogatory." But the ALJ also noted:

> Although not intended as derogatory, reasonable people could view the nickname as derogatory. This is especially true in light of the testimony that racial epithets had been used at the [Railroad] in the not-so-distant past. Mr. Rudd's use of this term may reflect a conscious or unconscious bias, and the apparent acceptance of his use of this term by others may reflect a more general conscious or unconscious discriminatory attitude that could have spilled over into the interview process.

The ALJ concluded that the nickname "may be circumstantial evidence of a discriminatory attitude and will be considered in conjunction with the entire record." The ALJ did not discount that the nickname might be probative of discrimination, concluding only that it did not necessarily establish discrimination in the decision not to hire Ross and had to be considered in light of other evidence. This essentially is how Ross argues that it should be considered, although he seems to believe the ALJ should have found the intent behind using the nickname was necessarily prejudicial.

"The substantial evidence test is highly deferential, but we still review the entire record to ensure that the evidence *detracting* from the agency's decision is not *dramatically* disproportionate to the evidence supporting it such that we cannot 'conscientiously' find the evidence to be 'substantial.' "[19] We do not review in isolation whether "Black Magic" was indicative of racial animus; we instead do what the parties request, namely review the record as a whole, keeping in mind that "Black Magic" may be probative of discriminatory intent.

### 2. Flynn's alleged racial prejudice

Ross also alleges that Flynn harbored racial prejudice against him and that it tainted the hiring process. Ross cites Morrison's email to the Railroad's counsel stating that Flynn had "formed an opinion about [Ross] and never let it go." Ross also cites Flynn's explanation during the investigation that one reason he did not want to hire Ross was because Flynn had learned that Ross could not complete the application by computer. Ross infers from this that Flynn likely believed, based on racial stereotypes, that Ross was unintelligent.

---

[19] *Local 803*, 420 P.3d at 1248 (emphases in original) (quoting *Shea*, 267 P.3d at 634 n.40).

The ALJ did not address these allegations in its recommendation, although supporting evidence was presented at the administrative hearing. Presumably the ALJ did not find Ross's allegations persuasive, and we do not find that decision necessarily unreasonable. It does not appear that Flynn was asked about his alleged bias during either the investigation or the administrative hearing, and Morrison's third-hand account alone is not necessarily conclusive. And although there may be reason to infer that Flynn's stated concern about Ross's computer skills was disingenuous — one candidate was selected even though he told the panelists his computer skills were "not great" and he "may need some training," and he also had completed the application by hand — Ross offers nothing indicating that Flynn's true motives were discriminatory aside from Morrison's account and a conclusory statement that Flynn must have believed Ross could not complete the application using a computer because of his race.

### 3.    Subjective criteria

Ross argues that the hiring panel's explanation that it based its hiring recommendations on enthusiasm should be closely scrutinized because using subjective hiring criteria such as enthusiasm often masks discriminatory intent. Ross asserts that this explanation cannot withstand close scrutiny in light of evidence of racial animus, because enthusiasm was unrelated to the job qualifications for trainmaster or the interview questionnaire the panel abandoned, and because panelists' testimony regarding Ross's interview demeanor contrasted with their testimony that he was normally outgoing and "animated." Ross notes that some panelists knew of his long tenure with the Railroad — including his experience in what he considered to be the comparable yardmaster position — but that they failed to share this information, and he also notes that the panel did not review personnel records.

The Railroad responds that interview performance constituted a legitimate basis for recommending whom to hire into a non-union, supervisory position, where

seniority was not determinative. The Railroad argues that using enthusiasm as a cover for discrimination would require an unlikely conspiracy among panelists and that the panel's decision not to recommend three white candidates because of poor interview performances indicates it instead based its decisions on interview performance. The Railroad further argues that evidence shows the panelists agreed Ross performed poorly in his interview and that he was not recommended for that reason.

The ALJ found the panelists' testimony regarding hiring criteria persuasive because, although subjective, enthusiasm for the position served a legitimate business purpose and was related to the job description, especially given the position's supervisory nature. The ALJ found persuasive the panelists' testimony that Ross was not recommended because he failed to show enthusiasm, despite testimony that he normally was outgoing. Ross testified to being annoyed during his interview, and panelists testified that they felt his mention of wanting a higher pension indicated he was solely interested in how the position could benefit him.

The Ninth Circuit repeatedly has stated that use of subjective hiring criteria should be closely scrutinized because such use readily can serve as a cover for discrimination.[20] It has favorably cited the Tenth Circuit's observation that "subjective criteria such as 'dedicated' and 'enthusiasm' may offer a convenient pretext for giving

---

[20]    *See Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1136 (9th Cir. 2003) ("[S]ubjective evaluations . . . are particularly 'susceptible of abuse and more likely to mask pretext.'" (quoting *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990))); *Jauregui v. City of Glendale*, 852 F.2d 1128, 1135-36 (9th Cir. 1988); *Atonio v. Wards Cove Packing Co.*, 810 F.2d 1477, 1484 (9th Cir. 1987) (en banc) ("Subjective practices may well be a covert means to effectuate intentional discrimination . . . ."); *Nanty v. Barrows Co.*, 660 F.2d 1327, 1334 (9th Cir. 1981) ("Subjective job criteria present potential for serious abuse and should be viewed with much skepticism."), *overruled on other grounds by O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 760 (9th Cir. 1996).

force and effect to prejudice, and can create a strong inference of employment discrimination."[21] We therefore closely examine the Railroad's use of subjective criteria.

Panelists testified that they based their recommendation decisions not just on candidates' enthusiasm for the position but also on their ability to communicate. Ross is incorrect that these criteria were unrelated to the trainmaster qualifications or to the interview questionnaire. The position description listed "communication" and "supervision and control" as job responsibilities. A trainmaster's duties include "[p]rovid[ing] employees with feedback on specific issues relating to job performance." Given the position's supervisory nature, it makes sense that the position description would place importance on an ability to communicate clearly with subordinates.

The interview questionnaire reflected the position description's emphasis on communication. One question read: "Good communicating skills are necessary to be an effective supervisor. Describe your communicating skills." The questionnaire further indicated that enthusiasm was an important hiring criterion. For example, one question asked, "How will the Alaska Railroad benefit from you being selected for this position?"

Ross suggests that the panel wholly abandoned the position description and questionnaire, but this was not the case. The panel did not ask all the questions to all the candidates, and it abandoned the grading system because of this and because of a lack of direction on using the grading system. But some panelists made notes serving as a reasonable proxy for grading enthusiasm and ability to communicate. For example, three panelists wrote that Ross said he wanted a better "high three" for his pension. Three wrote that Ross mentioned his supervisory experience; two wrote that he said he enjoyed

---

[21]     *Xin Liu*, 347 F.3d at 1137 (quoting *Lujan v. Walters*, 813 F.2d 1051, 1057 (10th Cir. 1987)).

working with people. Two wrote that he said he wanted the position to support his new wife. One wrote that he "did not offer a lot of info [and] did not explain in great detail on some of the questions."

The panelists' testimony that recommendation decisions were based on interview performance is consistent with an emphasis on enthusiasm and ability to communicate. For example, panelists testified that they felt Ross performed poorly in his interview because he gave short answers, which did not convey his desire to become trainmaster, and because he appeared to feel entitled to the position. Ross discounts this testimony because several panelists knew him to be normally outgoing, but at the hearing he admitted that he was "annoyed" when Flynn arrived late to the interview, which may well have affected Ross's demeanor. Regardless, panelists testified that they were concerned with candidates' enthusiasm for the trainmaster position, not whether they were generally outgoing or animated.

We find unpersuasive Ross's arguments that panelists who knew of his long tenure with the Railroad and his yardmaster experience should have shared this information and that the panelists should have consulted personnel records. Ross essentially suggests that the panel should have decided whom to recommend based on candidates' experience. But as the ALJ observed, the trainmaster position was supervisory and non-union; mere tenure was not determinative. And the ALJ found credible the testimony that the new trainmaster and former yardmaster positions materially differed and that Ross failed to inform the panel of relevant aspects of his experience. Although Ross testified that he stressed his experience in his interview, we generally defer to the fact finder's credibility determinations when reviewing

administrative adjudications for substantial evidence.[22]  We therefore conclude that the ALJ's finding that the hiring criteria were not pretext for discrimination is supported by substantial evidence.

The ALJ also discounted the possibility that racial animus might have played a part in the panel's decision not to recommend Ross because any one panelist's prejudices were unlikely to influence the four other panelists.  The Railroad urges us to adopt this position, arguing that accepting Ross's claim requires finding a conspiracy between panelists to use lack of enthusiasm as a cover for discrimination.  But this is not necessarily the case.  It is possible that the panel intended to base its recommendation decisions on some combination of enthusiasm, communication, and interview performance; that it decided not to recommend Ross for discriminatory reasons; and that it then used the criteria as a post-hoc rationalization for its decision.  Such a scenario would not necessitate a conspiracy.  Rudd, whose use of the nickname "Black Magic" may be probative of racial prejudice, was the Anchorage terminal superintendent and would have supervised Ross had he been hired as trainmaster.  Other panelists may have deferred to Rudd's judgment on which candidates to recommend; if for discriminatory reasons Rudd decided that Ross should not be recommended, then the rest of the panel may have gone along.  Ross's non-recommendation might have been based on discrimination, even if the majority of the panel had no discriminatory intent.

Enthusiasm, communication, and interview performance being post-hoc rationalizations for not selecting Ross finds some support in the fact that, although the Railroad stated it did not hire Ross and three white candidates because of poor interview performance, only interview notes for the three white candidates clearly indicated

_____

[22]    *Tesoro Corp. v. State, Dep't of Revenue*, 312 P.3d 830, 837 (Alaska 2013) ("In applying [the substantial evidence] standard, we will not . . . re-evaluate the fact finder's credibility determinations.").

significantly poor performance. Rudd's and another panelist's notes included evaluations of candidates' interview performance. Rudd described one white candidate as a "poor interview," another as "not a chance – poor," and the third as "didn't answer half of our questions – not a candidate." The other panelist described one white candidate as "not a strong personality"; that candidate "cried throughout [the] interview." Yet neither Rudd nor the other panelists made any similarly striking notes about Ross's interview performance. If Ross interviewed so poorly that the panelists decided not to recommend him for that reason, one would expect to find interview notes similar to those for the other candidates not hired because of poor interview performance. Other than one panelist's notes that Ross "[d]id not offer a lot of info[,] did not explain in great detail on some of the questions," panelists' notes contain no express indication of Ross's alleged poor communication or sense of entitlement that they later testified were reasons for not recommending him.

Panelists' focus on Ross's desire for a better "high three," both in interview notes and testimony, is suspect. An African-American former employee testified that during an interview for a position similar to trainmaster, an interviewer accused him of being interested only in earning his "high three." He testified that the interviewer later told him that he should not get the raise that came with the promotion. Rudd also interviewed that former employee and may have made a comment implying the employee was too lazy for the job, although the employee conceded that someone else may have made the comment. Despite being circumstantial, Rudd's involvement in the hiring process for both positions and alleged similar concern about the benefits accruing from a promotion — particularly concern about "high three" — suggest that panelists' invocation of Ross's sense of entitlement may have been tainted by racial animus. And the Railroad's denial of promotion benefits to African-American employees is supported by Ross's testimony that when he became yardmaster an attempt was made to give his

evening-shift differential to a white employee, "because they sa[id] that he was doing more [of] the work than I was." That white employee was Rudd.

### 4. Tenure and experience

Ross also argues that the Railroad's decision to leave trainmaster positions open rather than hire him, despite his having more years of experience than any other candidate and being the only candidate to have served in the allegedly similar yardmaster position, demonstrates discriminatory intent. The Railroad responds by citing the ALJ's recommendation that Ross's experience was not particularly relevant given the differences between the former yardmaster and new trainmaster positions and the trainmaster position's merit-based nature. The Railroad further stresses that Ross's tenure was not significantly longer than that of the four candidates selected for Anchorage trainmaster positions.

Although Ross had the longest tenure with the Railroad, it was not significantly longer than the tenure of other candidates. Compared to Ross's 36 years with the Railroad, most candidates — including those not selected — had worked there for 20 to 30 years. The four candidates hired as Anchorage trainmasters had been with the Railroad for a long time — one for 22 years, two for 29 years, and one for 30 years. Ample evidence supports the ALJ's findings that the position was merit based and that longevity with the Railroad was not a major factor in the hiring decisions. Even assuming Ross's three years in the former yardmaster position distinguished his experience, his qualifications were not "clearly superior" to those of other candidates — the ALJ found credible the testimony that the new trainmaster and the former yardmaster positions differed. The ALJ also found credible the testimony that Ross failed to inform the panel of relevant aspects of his experience and how he qualified for the new trainmaster position.

**5.** **Absence of African-American employees in management positions**

Ross briefly argues that the absence of any African-American managers in the transportation division augments the other evidence that the Railroad discriminated against him. The Railroad observes that the ALJ expressly discounted the significance of this fact, stating that "[w]ithout more information, it is impossible to determine whether the lack of minority supervisors is an anomaly that suggests discrimination, or the result of insufficient minority applicants. Therefore, the unexplained dearth of minority supervisors is of little, if any, probative or persuasive value." The Railroad stresses that this passage relies on U.S. Supreme Court precedent indicating the importance of statistical comparisons to establishing a pattern of discrimination.

There is some evidence that the absence of minorities in management is attributable to discrimination. Ross testified that when he had been yardmaster, an apparently white employee Ross had been training was promoted into a management position for which Ross had applied. An African-American former employee testified to being turned down for a position for racially suspect reasons. Still, this evidence is anecdotal and certainly not determinative.

**6.** **Conclusion**

Ultimately we review the Commission's decision for substantial supporting evidence in light of the whole record. Given the hiring process and use of subjective criteria, considered together with Rudd's use of the nickname "Black Magic," Ross's experience, and anecdotal evidence of African-Americans being denied other managerial positions, a fact finder might have determined that intentional or unintentional racial animus prevented Ross from being hired as a trainmaster. But the evidence detracting from the Commission's contrary decision is not dramatically disproportionate to the

supporting evidence;[23] we cannot conclude that the ALJ's adopted recommendation necessarily lacked substantial supporting evidence. The ALJ found credible the panelists' testimony about why Ross was not recommended, concluding that it likely was not fabricated and was related to the responsibilities of the trainmaster position.

We therefore conclude — based on the appropriate deferential standard of review — that it was not error for the Commission to determine Ross did not establish that the reasons the Railroad offered for not hiring him were pretextual.

## V.    CONCLUSION

The superior court's decision to uphold the Commission's decision is AFFIRMED.

---

[23]    *See Local 803*, 420 P.3d at 1248 ("The substantial evidence test is highly deferential, but we still review the entire record to ensure that the evidence *detracting* from the agency's decision is not *dramatically* disproportionate to the evidence supporting it such that we cannot 'conscientiously' find the evidence to be 'substantial.' " (emphasis in original) (quoting *Shea*, 267 P.3d at 634 n.40)).